**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

YU CHAN LI

|                                          |                        |
|------------------------------------------|------------------------|
| Plaintiff                                | **CASE NO.:**          |
| - against -                              | **1:21 - CV - 6726**   |

APPELLATE DIVISION OF THE NEW YORK          **COMPLAINT**
SUPREME COURT FIRST DEPARTMENT;             **CIVIL RIGHTS**
STATE OF NEW YORK;
NEW YORK CITY LANDMARKS PRESERVATION
COMMISSION;
SARAH CARROLL;
MARK A. SILBERMAN;
JOHN WIESS;
and CLAVA BRODSKY

                                              Defendants
_____

Plaintiff YU CHAN LI, for her complaint against Defendants APPELLATE DIVISION

OF THE NEW YORK SUPREME COURT FIRST DEPARTMENT; STATE OF NEW YORK;

NEW YORK CITY LANDMARKS PRESERVATION COMMISSION; SARAH CARROLL;

MARK A. SILBERMAN; JOHN WIESS; and CLAVA BRODSKY, by her counsel Marc H.

Gerstein, Esq., states and alleges as follows:

**INTRODUCTION - THE NATURE AND IMPORTANCE OF THIS ACTION**

1. Although the formal military combat phase of U.S. Civil War ended on April 9, 1865

and the period known as Reconstruction supposedly ended in the late 1870s, the reality is that the

Klu Klux Klan Act of 1871 (which evolved over time and is now known as 42 U.S.C. § 1983),

adopted with the intent to empower the Federal Judiciary to compel state and local officials to

respect civil rights or be held accountable for failure to do so, remains very much needed.

1

2. We know all too well about still-current struggles over racial equality and voting rights. Beyond that, however, people acting under color of state law have found many new and creative ways to deprive countless varieties of citizens countless varieties of civil rights. Some involve large and sometimes violent incidents that attract the attention of traditional and social media. The exponential growth in administrative agencies and innumerable regulations that govern increasingly intricate aspects of everyday life has multiplied these problems. The dangers so our legal and social fabric are magnified by judicial inclinations to refrain from second guessing administrative action and the ease with which administrative-law boilerplate cloaks agency ineptitude, abuse and bullying under a legal (but by no means factual) presumption of expertise. The result is a legion of people empowered to act under color of state law who feel completely secure and comfortable assuming they can do as they wish and that they are not really answerable to anybody — especially when, as is often the case, abusive activities tend to involve small facts that garner no media attention (involving, as they often do, arcane issues sound-bite-oriented reporters are unlikely to comprehend and which would, even if understood and published, attract little if anything in the way of revenue-producing page-views). This case involves one such obscure set of facts, and a collection of we-can-do-no-wrong self-proclaimed-sovereign civil servants and state judges who are disturbingly comfortable giving the little monarchs free reign to do as they wish with no regard to any form of bona fide law.

3. But as stated on page 6 of an Appellate Brief filed on behalf of Plaintiff YU CHAN LI in a case before Defendant APPELLATE DIVISION OF THE NEW YORK SUPREME COURT FIRST DEPARTMENT, "Our legal system is one in which small facts can and at times do generate big law."

4. The facts at the core of this case are exceptionally, almost embarrassingly, small. They

involve the look of a portion of a waist high fence in front of a nondescript private residence in Jackson Heights, Queens, New York that separates the public sidewalk from a private front lawn. To normal reasonable people, this is a classic case of *de minimis non curat lex*. Defendant NEW YORK CITY LANDMARKS PRESERVATION COMMISSION chose, however, to make the *de maximus* effort, supported by a cadre of courtiers-enablers (identified in varying portions of this Complaint) named to fight as hard as possible to defend the monarchical power they seized   to itself and to assure personal whim — defined not by any valid LPC policy or standard but by how Commissioners feel on "any given Tuesday"[1] — triumph over constitution, statute, regulation or judicial precedent.

5. Perhaps the Defendants here believed the facts were so small, Plaintiff wouldn't bother to fight.[2] And perhaps past experience supports such an attitude. How many of the ordinary citizens impacted by administrative expertise and bad-faith judicial rulings have the resources to mount a challenge? How much of the body of agency regulation today owes its existence to nothing more than the inability of the average person to fight back in court, or even at the ballot box (aside from the voting right issues that plague the news today, we're not dealing with actions of persons who were elected to anything). In this case, however, Defendants are wrong.

6. Plaintiff, born in Guangzhou China and raised under the horrors of the Mao-era Cultural Revolution, including the need to scrounge scarce food to bring daily to the stockade where her father was imprisoned in order that he not starve (the Red Guard did not feed prisoners) and risking

---

[1] As will be seen *infra*, this is a direct quote from the LPC's Deputy Chair and a perfect description of how the LPC adjudicated Plaintiff's rights at an 11/24/15 hearing that gave rise to the controversy now before the bar.

[2] As will be seen *infra*, Appellate Division Frist Department Justice Jeffrey K. Oing implicitly dared Plaintiff to bring this lawsuit. Whether he imagined it would ever happen is something the Justice will have to answer for himself. But regardless of what he imagined, the lawsuit he proposed is now under way. And it's in this Federal Court because of a hint from Appellate Division First Department Justice Dianne T. Renwick that Plaintiff should not expect fair and unbiased treatment from the First Department if the case were filed in State Supreme Court and wound up back before the First Department on appeal.

who-knows-what to surreptitiously slip her father a bit of alcoholic beverage every now and then, did not emigrate to the U.S. and attain citizenship and work hard to build a life here in order to bow passively before Red-Guard-like thugs from which she fled and subject herself to whatever abuse they wish to mete out. This Plaintiff will not leave well enough alone.

7. Plaintiff fully understands that it may seem odd to compare a landmarking controversy to Reconstruction era violence or the Chinese Cultural Revolution. But this oddity is what makes the landmarking controversy so dangerous today. It's so easy — too easy — to brush it aside and not care about it as the New York State judiciary was sadly eager to do.

8. But doing so in effect ratifies and encourages the worst of the worst in terms of attorney conduct, agency conduct and judicial conduct.

9. Little problems, if let unaddressed, grow to become bigger problems and eventually to catastrophic problems. We see this in the human body as a tiny tumor that's ignored can grow and grow and grow until it becomes terminal cancer. But if excised early the person goes on to live a full and healthy life. We saw with the Space Shuttle Challenger, how a weakness in a tiny seemingly insignificant component, later identified as an O-Ring, broke shortly after liftoff resulting in a devastating explosion that killed all aboard. Closer to home, events around the U.S. following the 2020 Presidential election illustrate the dire and horrific consequences of the legal system's long-standing tolerance of lawyers supposedly being lawyers (i.e. human pit bulls who stop at nothing in order to achieve victory at all costs and without regard to law or ethics), bureaucrats being bureaucrats (i.e. reading and complying with applicable regulations when and if they feel like it, thereby generating a degree of quietly simmering public rage that has recently started to boil over as large segments of society react to the so-called "deep state"), and judges hiding behind simplistic boilerplate rulings that cover bias, thus giving aid and comfort to nefarious

lawyers who come to assume judges will be malleable to the political desires of the moment.

10. As illustrated by recent events, particularly those at the U.S. Capital on January 6, 2021, the cancer in our legal system is spreading and if unchecked, threatens to eventually kill the patient; U.S. Society as governed by the U.S. Constitution and similarly governed state and local societies. (It looks, as of this date, to have already killed the reputation and career of one-time two-term New York City Mayor and *Time Magazine* 2009 "Man of the Year" Rudolph Giuliani.)

11. The grant of relief sought by Plaintiff herein will not by itself be enough to make our body-politic cancer free. But if we are to have any hope of ever turning the tide from our rapidly progressing legal disease, we must start somewhere and act vigorously to destroy whatever cancerous tumors — even seemingly minuscule ones — become visible. Plaintiff files this action in order to obtain from this Court judgments that will do exactly that; by excising the legal "tumors" the Defendants herein have set themselves up to be. It is to be hoped that decisive action in one court — this Court — will inspire other courts to do likewise, and that action in such other courts will inspire still more courts and so on and so forth until our legal system is cancer free and functioning in real life as the law requires.

12. In addition to the foregoing "big-picture" considerations, there remains one important little-picture consideration: Plaintiff's civil rights were violated by Defendants and 42 U.S.C. §1983 entitles her to the relief she seeks.

**STATUTORY AND LEGAL  FRAMEWORKS**

13. This action involves the Due Process clause of the 5th Amendment to the United States Constitution which is binding on the States via the Sections 1 and 5 of the 14th Amendment to the United States Constitution, The Equal Protection (1st) clause of the 14th Amendment to the United

States Constitution and Section 1983 of the Title 42 of the U.S. Code ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .").

14. Money damages are being sought against the four named individual defendants, none of who have immunity. Three of the four individual defendants are attorneys admitted to practice in New York State and this record will serve as the basis for claims of ethical violations that will be submitted to the appropriate Grievance Committee(s).

15. Injunctive/declaratory relief only is sought against the government-entity defendants.

16. Five New York State judges whose behavior was culpable and key to this case are not named as parties due to the doctrine of judicial immunity shields them from liability under 42 U.S.C. §1983, however the record in this case will serve as the basis for complaints against them to the New York Commission on Judicial Conduct.

17. One other attorney is discussed as a key individual but is not named as a defendant because suit against her might be barred by the Statute of Limitations. The role of statute of limitations is uncertain and frankly, Plaintiff has not fully researched that issue because even if she were able to be named as a party, Plaintiff believes the nexus between her conduct and the specific events that give rise to this case is weak at best. In any case, this record will serve as the basis for claims of ethical violations that will be submitted to the appropriate Grievance Committee.

**JURISDICTION**

18. Jurisdiction arises because this case involves Federal Questions per 28 U.S.C. §1331 including Civil Rights Claims arising under 42 U.S.C. §1983.

**VENUE**

19. Venue is properly laid in the Southern District of New York pursuant to 28 U.S.C. §1391(b)(1) because all defendants that are entities reside in New York County within the Southern District. Venue pertaining to individual defendants who are domiciled within the Southern District is likewise based on 28 U.S.C. §1391(b)(1) however as to those that are domiciled elsewhere, all are served at their primary place of business within the Southern District and, hence, venue in this district is proper under of t 28 U.S.C. §1391(b)(3).

**JOINDER OF PARTIES**

20. This case involves multiple instances of conduct on the part of multiple parties, government entities and individuals, all of which were part of a single series of transactions and occurrences involving common questions of law hence the parties are all joined pursuant to FRCP 20(a)(2)(A)-(B).

**THE NAMED PARTIES**

21. Plaintiff YU CHAN LI (hereinafter, "Plaintiff", also referred to as "Petitioner" when referred to in language contained in documents relating to prior administrative and state-court proceedings), born in Guangzhou China, is a naturalized citizen of the United States and the owner of residential property at 34-45 83rd Street, Jackson Heights, New York 11372 which property is

located within what is known as the Jackson Heights Historic District.

22. The APPELLATE DIVISION OF THE NEW YORK SUPREME COURT FIRST DEPARTMENT (hereinafter "1st Dept.") is one of four intermediate appellate courts in the State of New York, and in many cases that originate in Supreme Court (the primary trial court of the state) of New York County, is the only forum before which an aggrieved party may appeal (the higher and highest Court in the State, the New York Court of Appeals is limited to hearing cases where statute confers appeal to that court as a matter of right — this controversy herein was not included among appeal-as-of-right cases — and the small number the Court of Appeals chooses to hear as a matter of its discretion and choice. Injunctive relief only — not monetary damages — is being sought against this Defendant.

23. The STATE OF NEW YORK (hereinafter "the State") is one of the fifty states that comprise the United States of America and although not an active participant in any of the matters complained of herein, is named as a party in its capacity as having constituted the 1st Dept. and because the constitutionality of an act of the New York State Legislature is being challenged.

24. THE NEW YORK CITY LANDMARKS PRESERVATION COMMISSION (hereinafter "LPC") is an agency of the City of New York created by and charged with the duty to administer the Landmarks Law (N.Y.C. Local Law 46/1965; Admin. Code §§ 25-301-322) in order to protect places of historic, architectural or cultural significance. Preserving these places and districts of cultural significance was crucial to safeguarding the "city's historic, aesthetic and cultural heritage," and to ensure that the City remains a center for tourism, business, and culture. Admin. Code § 25-301(b). This is supposed to be accomplished by permitting alterations of buildings so long as they are deemed appropriate by the LPC consistent with the purpose of preserving spaces of special historic and aesthetic interest. Admin. Code § 25-307. Since having

been created in 1965, however, the LPC has largely abandoned and strayed far far far beyond its statutory mission and has been embarking on an unauthorized mission to appoint itself absolute architectural Tsar of New York City, bringing countless properties under its jurisdiction, regulating details in petty, bullying and abusive manners that ignore the "city's historic, aesthetic and cultural heritage" and serve only the personal whims of the bureaucrats who work at the agency and very narrow elitist effete radical preservationist pressure groups, often little or no nexus with the communities and properties they attack. The LPC has gone so far to appease radical activists as to the point of openly obstructing critical elements of New York City public policy such as the desperate need for affordable housing.[3] This will be explored further in another action being commenced against the LPC in Supreme Court of the State of New York, Count of Queens in which it is alleged (and, for all practical purposes conceded by the LPC in prior litigation) that it defrauded the City Council in 1993 when it induced that legislative body to approve the establishment of the Jackson Heights Historic District by suppressing information known to the LPC that the District was established as a racist, nativist enclave designed to allow white supremacists to live in a self-contained community where they would be free from the burden of having to interact with people of color, immigrants and Jews. Injunctive relief will be sought in that case from the state court. This case, which involves a deprivation of procedural due process, seeks injunctive relief only — not monetary damages — against the LPC.

25. SARAH CARROLL (hereinafter "Carroll"), formerly Executive Director of the LPC, is Chair of the LPC and an active participant, perhaps the primary participant, in the actions that give rise to the specific causes of action asserted herein against LPC: Monetary damages are being sought against this individual defendant. Carroll has no absolute or qualified immunity from

---

[3] *See, e.g., "Smaller" Plan For 250 Water Street In South Street Seaport Approved by Landmarks Commission*, https://gothamist.com/news/smaller-plan-250-water-street-south-street-seaport-approved-landmarks-commission

liability under 42 U.S.C. §1983 because the conduct complained of herein does not involve executive policymaking on behalf of the LPC but only her refusal to perform a ministerial duty she was legally obligated to perform in compliance with a New York State Supreme Court determination, a determination the LPC actively sought in Supreme Court and related Appellate proceedings.

26. MARK A. SILBERMAN (hereinafter "Silberman") is General Counsel of the LPC and upon information and belief, played an important role in advising, counseling, aiding and abetting in the actions that give rise to causes of action asserted herein: Monetary damages are being sought against this individual defendant. Silberman has no absolute or qualified immunity from liability under 42 U.S.C. §1983 because the conduct complained of herein involves his having aided, abetted and/or encouraged Defendant Carroll's refusal to perform a ministerial duty in compliance with a New York State Supreme Court determination, a determination the LPC actively sought in Supreme Court and related Appellate proceedings.

27. JOHN WEISS (hereinafter "Weiss") is Deputy Counsel of the LPC and upon information and belief, played an important role in advising, counseling, aiding and abetting in the actions that give rise to causes of action asserted herein: Monetary damages are being sought against this individual defendant. Silberman has no absolute or qualified immunity from liability under 42 U.S.C. §1983 because the conduct complained of herein involves his having aided, abetted and/or encouraged Defendant Carroll's refusal to perform a ministerial duty in compliance with a New York State Supreme Court determination, a determination the LPC actively sought in Supreme Court and related Appellate proceedings.

28. CLAVA BRODSKY (hereinafter "Brodsky") is an attorney who at all times pertinent to this case against her worked in the Appeals Bureau of the Office of the Corporation Counsel of

the City of New York (also referred to as the Law Department) and is named for having knowingly and in violation of the New York Code of Professional Responsibility — Rules 3.1 and 3.3(a)(1) — urged, aided and abetted the 1st Dept. and the LPC in having enabled the alleged civil rights violations alleged herein. Monetary damages are being sought against this individual defendant. Plaintiff was initially uncertain as to whether or not Brodsky played a sufficiently direct role in the conduct misconduct complained of herein too warrant naming her as a Defendant in this case and in an effort to limit the number of defendants only to those against who action is reasonably likely to succeed, advised Brodsky by June 8, 2021 email that "At present, I am assuming that you have advised the LPC to take the position it is taking viz. the court rulings and that you are aiding and abetting in the misconduct of the individuals involved. If this is not so, Ms. Brodsky, I strongly suggest you communicate to me as quickly as possible to better explain your situation." To date, Brodsky has failed and refused to respond, thereby raising a sufficient inference of culpability to warrant naming her as an individual Defendant.

## OTHER KEY INDIVIDUALS

29. MARC H. GERSTEIN, ESQ. (hereinafter "Gerstein") is Plaintiff's husband and is acting and throughout this case  has acted as Plaintiff's Counsel of record. Gerstein graduated law school in the late 1970s and since that time has continuously been and still is admitted to practice before the Courts of the State of New York, the U.S.  Court of Appeals for the Second Circuit, the U.S. Court for the Southern District of New York (this Court), and the U.S. District Court for the Eastern District of New York. Gerstein practiced law for about three years after his June 1976 law-school graduation, and then, intermittently on a per-diem basis in the mid- to- late 1990s but since December 1980 had devoted the primary portion of his professional endeavor to the field of

investment finance (mainly relating to the stock-market) and he currently serves as Director of Research of Chaikin Analytics. Gerstein re-engaged with the law on a limited basis in 2015, when this controversy arose and since then has been and still is representing clients before the Civil Court of New York (Housing Part) and the Supreme Court of New York (Queens County). Because the property in question is 100 percent owned by Plaintiff, Gerstein does not fit within the formal definition of *pro se* as would be the case if he had any ownership interest. However, because of his marital relationship with Plaintiff, the form of Gerstein's role is counsel but he is in substance a *pro se* party. It is not anticipated that Gerstein would have to give any testimony in this case since all pertinent facts to which he could conceivably testify are established by documentary evidence.

30. JUSTICE KATHRYN E. FREED (hereinafter "J. Freed") is a Justice of the Supreme Court of the State of New York County of New York and it will be alleged in this complaint that she acted in an extremely culpable manner. She is not named as a party only because of the current state of the law that gives judges immunity for conduct that violates 42 U.S.C. §1983. The record of this case shall, however, serve as a basis for a complaint against J. Freed before the New York State Commission on Judicial Conduct seeking disciplinary action for her having violated Part 100 (relating to "Judicial Conduct") of the Rules of the (New York State) Chief Administrative Judge, particularly Sections 100.1, 100.2(A)-(B), 100.3(B)(1), 100.3(D)(2), 100.3(B)(7) and 100.3(E)(1)(a).

31. JUSTICE DIANNE T. RENWICK (hereinafter "J. Renwick") is an Associated Justice of the 1st Dept. and it will be alleged in this complaint that she acted in an actively and extremely culpable manner. She is not named as a party only because of the current state of the law that gives judges immunity for conduct that violates 42 U.S.C. §1983. The record of this case shall, however,

serve as a basis for a complaint against J. Renwick before the New York State Commission on Judicial Conduct seeking disciplinary action for her having violated Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, particularly Sections 100.1, 100.2(A)-(B), 100.3(B)(1), 100.3(D)(1)-(2), 100.3(B)(7) and 100.3(E)(1)(a).

32. JUSTICE PETER H. MOULTON (hereinafter "J. Moulton") is an Associated Justice of the 1st Dept. and it will be alleged in this complaint that he acted in an actively and extremely culpable manner. He is not named as a party only because of the current state of the law that gives judges immunity for conduct that violates 42 U.S.C. §1983. The record of this case shall, however, serve as a basis for a complaint against J. Moulton before the New York State Commission on Judicial Conduct seeking disciplinary action for his having violated Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, particularly Sections 100.1, 100.2(A)-(B), 100.3(B)(1), 100.3(D)(1)-(2), 100.3(B)(7) and 100.3(E)(1)(a).

33. JUSTICE JEFFREY K. OING (hereinafter "J. Oing") is an Associated Justice of the 1st Dept. and it will be alleged in this complaint that he acted in an actively and extremely culpable manner. He is not named as a party only because of the current state of the law that gives judges immunity for conduct that violates 42 U.S.C. §1983. The record of this case shall, however, serve as a basis for a complaint against J. Oing before the New York State Commission on Judicial Conduct seeking disciplinary action for his having violated Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, particularly Sections 100.1, 100.2(A)-(B), 100.3(B)(1), 100.3(D)(1)-(2), 100.3(B)(7) and 100.3(E)(1)(a).

34. JUSTICE ANIL C. SINGH (hereinafter "J. Singh") is an Associated Justice of the 1st Dept. and it will be alleged in this complaint that he acted in an actively and extremely culpable manner. He is not named as a party only because of the current state of the law that gives judges

immunity for conduct that violates 42 U.S.C. §1983. The record of this case shall, however, serve as a basis for a complaint against J. Singh before the New York State Commission on Judicial Conduct seeking disciplinary action for his having violated Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge,  particularly Sections 100.1, 100.2(A)-(B), 100.3(B)(1), 100.3(D)(1)-(2), 100.3(B)(7) and 100.3(E)(1)(a).

35. JACQUELINE HUI, ESQ., represented the LPC during the Supreme Court phase of an Article 78 Proceeding commenced by Plaintiff against the LPC as Of Counsel to the Corporation Counsel of the City of New York. While conduct on her part in violation of the New York Code of Professional Responsibility (Rule 3.1) was the initial catalyst for the misconduct of the LPC and the individual defendants complained of herein, she is not named as a party because her conduct is too remote and probably too far back in time to fall within the statute of limitations.

36. Other LPC staff members and Commissioners are not currently named as Defendants in this action because at this time Plaintiff does not have sufficient information or belief suggesting active involvement in the conduct complained of but would seek to join them as parties in this action and seek monetary damages if facts uncovered during the course of this action and before expiration of the statute of limitations against them were to uncover actionable wrongdoing on the part of any of them.


**FACTUAL BACKGROUND**

37. Plaintiff owns and resides in a private home located at 34-45 83rd Street, Jackson Heights, New York 11372 which she purchased in 1996.

38. The property is located within the Jackson Heights Historic District, which was established by the LPC and memorialized by a "Designation Report" dated October 19, 1993.

39. The subject property is governed by the New York City Landmark Law *Administrative Code of the City of New York* (hereinafter, "ACCNY") Article 25 and LPC is the agency charged by the City with the administration and enforcement of that law.

40. In late-2014, Plaintiff demolished an old deteriorating wrought iron fence in front of her property and replaced it with a new one without having sought prior LPC approval.

41. Plaintiff concedes that this unilateral action was wrong but asserts that she had a statutory right under ACCNY §25-317.1b(1) to file with LPC a Petition to retroactively "legalize" the improvement, and that she did so on in early 2015.

42. This is a perfectly acceptable way to have proceeded and no negative inference at all can be drawn regarding Plaintiff's conduct given that a unilateral choice to modify one's own property is not something that is self-evident to any reasonable person — meaning her unlawful conduct is not *malum in se* but is instead, merely *malum in prohibitum*, that being the logical basis for the choice of the legislative body that enacted the law to include therein ACCNY §25-317.1b(1).

43. The LPC held a hearing to determine the appropriateness of the alteration to the fence in front of Plaintiff's property on November 24, 2015 and the Commissioners ultimately issued a determination granting the petition to legalize, subject to the imposition of the following condition: "However, in voting to grant this approval, the Commission required: that the applicant remove the masonry posts and modify or replace the existing fence and gate with a more simply designed fence and gate."

44. Plaintiff challenged the imposition of that condition via Article 78 Proceeding in New York State Supreme Court, County of New York (Index No. 100241/2016) alleging that the condition imposed on the approval was arbitrary and capricious.

45. Plaintiff did not prevail in any aspect of the Supreme Court case nor were any of the actions she took at the appellate levels successful.

46. This Civil Rights action against Defendants LPC, Carroll, Silberman Weiss and Brodsky relate to their knowing and malicious refusal to act in a constitutionally proper manner in accordance with an element of the final and now-governing outcome of the New York State litigation; an outcome which these Defendants actively sought and for which they actively argued.

47. This Civil Rights action against the 1st Dept. is a highly unusual one, but an important one given that the actions of the 1st Dept., if not addressed via injunctive relief, would contribute to what appears to be a serious and escalating deterioration in the integrity of the judiciary of New York State, a state of affairs people of this nation— regardless of political affiliation or belief — can ill afford to tolerate. On the surface, the conduct of the 1st Dept. appears routine and lawful: It denied a motion to reargue a ruling it made dismissing an appeal on the ground that it was from a motion to reargue, a matter that is normally within the discretion of a court. On closer examination, however, it will be seen that discretion in this specific case was so horrifically abused to the point that the four justices that acted on behalf of the 1st Department had to violate several provisions of Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge in order to deny Plaintiff her day in an unbiased untainted court contrary to requirements of due process mandated by the Fifth and Fourteenth Amendments to the U.S. Constitution.

48. The naming of the State of New York as a party to this action is a formality and is done because some of Plaintiff's causes of action assert that Section 5701 of the New York Civil Practice Law and Rules (CPLR) is, at the very least, unconstitutional (under the U.S. Constitution) as applied specifically to her and/or unconstitutional as regularly administered by Appellate Divisions

in the State of New York and/or unconstitutional on its face because (i) of the ambiguity and confusion it fosters regarding appellate treatment of appeals from denial of motions to reargue and/or (ii) because it treats parties similarly situated (parties aggrieved by denials of motions to reargue and parties aggrieved by denials of motions to renew) differently and in violation of the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution.

**UNCONSTITUTIONAL ENCUMBRANCE — LANDMARKS-RELATED VIOLATION — AGAINST DEFENDANT'S REAL PROPERTY, AND THREATS OF CIVIL AND/OR CRIMINAL PENALTIES IF PLAINTIFF FAILS TO COMPLY WITH A NON-BINDING LANDMARKS COMMISSION DETERMINATION**

**A.  Background - The Authority of and Statutory Framework of The LPC**

49. ACCNY Title 25 is extremely broad, enough so to seemingly empower LPC to reach any decision at all on any property or improvement, so much so that LPC Commissioner and Deputy Chair Frederic Bland openly boasted about the LPC's regular practice of proceeding in this very manner by when he told a reporter that the LPC judges the appropriateness of alterations to landmarked properties or properties located within historic districts based on how the Commissioners feel on "any given Tuesday." Although that statement was made subsequent to the LPC's hearing in this particular case, the record of the LPC proceeding in this matter makes clear beyond any doubt that this is exactly how the Commission ruled in the Plaintiff's case. Abundant video records of LPC proceedings posted by the LPC on Youtube demonstrate that "any given Tuesday" is, in fact, an accurate description of the LPC regular method of decision-making.

50. It is not supposed to be this way.

51. ACCNY Title 25 tells the LPC what questions it may consider but provides no guidance as to how any of those questions are to be answered.[4]

52. On its face, the exceptionally broad language used in the statute might seem to endorse the LPC's inherently arbitrary and capricious approach to decision-making: It goes without saying, however, that this level of vagueness would, if left to stand alone, pose challenges to the constitutionality of the law as well as its potential validity under New York State Law (the existence of CPLR Article 78 makes it obvious that neither New York City nor any other municipality has the power to authorize LPC or any other agency to act in an arbitrary or capricious manner).

53. To guard against unconstitutional vagueness and to assure that LPC's decision-making is neither arbitrary nor capricious, and to prevent a potentially futile effort to articulate a set of uniform across-the-board  criteria for evaluating that which the statute directs LPC to evaluate, ACCNY §25-302 f-1, defines into existence a Designation Report (also colloquially referred to as a Designation Document) as "[T]he report prepared by the commission and used as a basis for designating a landmark or historic district pursuant to this chapter."

---

[4] ACCNY §25-301(b) says the purpose of the law is to (a) effect and accomplish the protection, enhancement and perpetuation of such improvements and landscape features and of districts which represent or reflect elements of the city's cultural, social, economic, political and architectural history; (b) safeguard the city's historic, aesthetic and cultural heritage, as embodied and reflected in such improvements, landscape features and districts; (c) stabilize and improve property values in such districts; (d) foster civic pride in the beauty and noble accomplishments of the past; (e) protect and enhance the city's attractions to tourists and visitors and the support and stimulus to business and industry thereby provided; (f) strengthen the economy of the city; and (g) promote the use of historic districts, landmarks, interior landmarks and scenic landmarks for the education, pleasure and welfare of the people of the city.

As to what the LPC should consider, ACCNY §25-307(b)(a) refers to "the effect of the proposed work in creating, changing, destroying or affecting the exterior architectural features of the improvement upon which such work is to be done, and (b) the relationship between the results of such work and the exterior architectural features of other, neighboring improvements in such district. In appraising such effects and relationship, the commission shall consider, in addition to any other pertinent matters, the factors of aesthetic, historical and architectural values and significance, architectural style, design, arrangement, texture, material and color."

54. It's reasonable to assume that such documents articulate the standards that must govern LPC decision making, and indeed, LPC, on its web site, articulates this exact proposition when it states that these reports

> . . . detail the historical, architectural and cultural significance of every individual landmark or historic district approved by the Landmarks Preservation Commission. *The reports serve as the basis for designation and regulation of future alterations*, as they describe in detail the physical appearance of each building on the site at the time they receive landmark designation.

55. These reports are what give constitutionally-necessary clarity to the Landmarks Law and are the basis for administrative non-arbitrary non-capricious decision-making.

56. The Designation Document that governs this specific case is the October 19, 1993 designation document entitled "Jackson Heights Historic District."

## B. LPC Hearings and Enforcement

57. Insofar as is relevant to this case, there are two kinds of hearings regularly conducted by the LPC pursuant to various statutes.

### (i) Informational Hearings

58. One kind of hearing, which will be referred to as an "Informational Hearing," is designed to assist the LPC in exercising administrative discretion in a variety of ways. The most widely known purpose of an Informational Hearing is to gather information to assist the LPC in deciding whether or not to designate a property or district as being historic and subject to future regulation by the LPC. Such hearings, similar to those conducted by federal, state and other city agencies in general, are typically open to the public and members of the public are given opportunities to express their views regarding the policy the agency is considering.

59. Occasionally, one or more members of the public feels aggrieved by not having had what that person considers to be an adequate opportunity to express views. However, 1st Dept. made it is very clear a long time ago that because LPC Informational Hearings are not adjudicative and adversarial (i.e., the rights of an individual with respect to person or property are <u>not</u> being adjudicated and no restrictions on behavior or penalties can result from such a hearing) but mere information-gathering fora, and that no member of the public can claim a legal right to be heard at such a hearing. *Gilbert v. Board of Estimate of the City of New York*, 177 A.D.2d 252 (1st Dept. 1991) (hereinafter "Gilbert").

60. Because Informational Hearings are designed to gather information, not to adjudicate rights of make decisions non-compliance with which might subject one to penalties, no individual can claim a due-process right to be heard.

### (ii) Adjudicative Hearings

61. The other kind of hearing typically conducted by the LPC (as well as other federal, state and city agencies) is what will hereinafter be referred to as an "Adjudicative Hearing." In these instances, the LPC is not gathering information  to assist in broad policymaking. Adjudicative Hearings come into play only after a policy has already been promulgated and the need arises to make specific decisions impacting specific individuals and/or properties as the LPC applies its already promulgated policy to determine personal and/or property rights.

62. LPC Adjudicative Hearings fall under the ambit of ACCNY §25-317.1, which addresses penalties and begin with issuance by the LPC of a "Warning Letter" that, according to the Warning Letter sent to Plaintiff in this matter, specifically threatened "a civil penalty as high as $5,000," potential for a further "civil penalty as high as $250 per day," and potential "criminal

penalties." Incidental to the issuance of a warning letter is the placement of a landmarks-related "violation" against the property.

63. At this point, the property owner can "fix" the situation by making changes desired by the LPC or apply to the LPC to retroactively "legalize" the property as it is. Either way, the LPC would conduct an Adjudicative Hearing to determine whether the condition sought to be legalized is "appropriate" to the LPC designation, and hence acceptable.

64. If it comes to the point that a property owner would face penalties had the LPC wished to proceed in the event (i) Plaintiff ignored the Warning Letter and the violation placed on her property and not filed a petition with LPC to legalize, or (ii) fails to comply the determination issued by the LPC at an Adjudicative Hearing, the matter would then be referred to the LPC's Enforcement Department (the unit that issues the warning letters and violations) and then brought to the New York City Office of Administrative Trials and Hearing (OATH), for determination of a penalty.

65. Opportunities for hearing do exist at OATH but the OATH hearing is not the forum for arguing that the work at issue is appropriate to the landmark. Specifically, LPC states on its web site, as follows:

> If the owner/recipient does not take advantage of the grace periods, or wants to contest the NOV, a hearing will be held at the Office of Administrative Trials and Hearings (OATH) where they can argue his or her case. If the court finds that a violation has occurred, a civil penalty will be assessed. The OATH hearing is unrelated to the public hearing held by the Landmarks Commission. *The OATH hearing is not the forum for arguing that the work at issue is appropriate to the landmark.* The OATH hearing is largely limited to the issue of whether work was performed without a permit or in noncompliance with a permit or if technical requirements concerning the service of the NOV were met. Valid defenses at the OATH hearing include having a landmark permit to do the work or that the work at issue predates the designation

of the property as a landmark. Ignorance of landmark status or need for permits are not valid defenses.

If the owner/recipient fails to cure the violation even after a NOV, the Commission may issue subsequent NOVs until the violation is cured. The subsequent NOVs are not accompanied by grace periods.[5]

(Emphasis Supplied.)

66. There can be no non-frivolous argument that the <u>only</u> opportunity Plaintiff has to argue against a potential LPC action that she would be required to follow or face civil and/or criminal penalties if she didn't would be an Adjudicative Hearing.

67. There can likewise be no non-frivolous argument against the proposition that no person can ever be subject to any form of civil or criminal penalty absent due process, which requires a full and fair opportunity to effectively argue based on law and/or facts and that an any attempt to "enforce" a determination reached at an Informational (i.e., non-Adjudicative) hearing would violate a party's civil rights and give rise to a cause of action under 42 U.S.C. §1983.

**(iii) The Hearing Involved In The Instant Case: An Adjudicative Hearing**

68. The 11/24/15 LPC hearing involved in the instant case was an Adjudicative Hearing.

69. However, due to the efforts of Hui, and Defendant Brodsky (aided and abetted on information and belief by Defendants Silberman and Weiss), this controversy came all the way through New York State with a final determination to the effect that the 11/24/15 LPC hearing was not Adjudicative but Informational.

---

[5] https://www1.nyc.gov/site/lpc/violations/violations.page

70. Hui, Brodsky, Silberman and Weiss know full well the State courts got it wrong — thanks to their frivolous advocacy — and this will serve as a basis for ethics-related charges to be brought against them under the appropriate state process.

71. Hui made that clear to the Supreme Court in the Memorandum of Law she initially submitted in opposition to the original Article 78 Petition when she stated, on page 3 "LPC issued Petitioner a Warning Letter . . . ." and again on page 3 of the Memorandum of Law she submitted in opposition to Plaintiff's motion to re-argue when she again wrote "LPC issued Petitioner a Warning Letter . . . ."

72. Hui knew with absolute complete 100 percent certainty that the only LPC hearing involved in the instant case was an Adjudicative Hearing.

73. Brodsky likewise made that clear to 1st Dept. when she stated, in the PRELIMINARY STATEMENT portion of her Brief "[a]fter receiving a *Warning Letter* from the Landmarks Preservation Commission, petitioner applied to retroactively legalize . . . ." and again on page 10, when she stated "Not long after, on January 9, 2015, the Commission sent petitioner a '*Warning Letter*,' informing her that she installed her fence in violation of the Landmarks Law . . . . The letter explained that she had 20 working days to cure the violation; otherwise, *she would be served with a notice of violation, exposing her to civil liability*." And as will be detailed *infra*, Brodsky sent an email to Gerstein on January 21, 2021 threatening "further enforcement action" if Plaintiff does not comply with the directive issued by the LPC at its 11/24/15 hearing.

74. Brodsky knew and knows with absolute complete 100 percent certainty that the only LPC hearing involved in the instant case was an Adjudicative Hearing.

75. Weiss, who as Deputy Counsel for the LPC and actively participated in preparations for the 11/24/15 LPC hearing cannot deny — without subjecting himself to prosecution for perjury

— that this matter was commenced via LPC Warning Letter. Weiss also sent an email to Gerstein on June 8, 2021, in which he threatened that "[i]f the violation is not addressed, it can be problematic if you refinance or sell your property. There also is the potential for a summons to be issued which would result in you needing to appear before an administrative judge at the Office of Administrative Trials and Hearings."

76. Silberman, who as LPC General Counsel actively participated in the 11/24/15 hearing and Carroll, who is current LPC Chair but at the time of the 11/24/15 hearing was Director of Preservation at the LPC (and whose attention was called to this matter by Gerstein in an email complaining to her of misconduct on the part of Preservationists who worked on the case) cannot deny — without committing perjury — that she knew this matter was commenced via Warning Letter.

77. Silberman and Carroll knew and know with absolute complete 100 percent certainty that the only LPC hearing involved in the instant case was an Adjudicative Hearing.

78. Due Process requires that one who is subject to an Adjudicative Hearing be entitled to a full and fair right to make effective factual and/or legal argument.

79. They also know that Plaintiff's claim that the 11/24/15 hearing did not offer proper due process — i.e., Plaintiff contended that the LPC obstructed Plaintiff's ability to make effective legal arguments, was never addressed by the state courts and that the state courts instead simply held that plaintiff had no right to make any argument at all at what it ruled was an Informational Hearing.

80. So after having succeeded in obstructing Plaintiff from making effective legal arguments at the 11/24/15 hearing, and after having gotten a "win" in state court the only way they could, by having gaslighted the state courts into sticking with its characterization of the hearing as

having been Informational, LPC and the individual defendants now close their eyes, pretend the state court proceedings (that thy "won") never happened, and act on the basis of the hearing having been Adjudicative — a repulsive effort at sleight of hand that will, hopefully, lead to the attorneys involved being permanently disbarred.[6]

**C. Prior to the Adjudicative Hearing in this Case, LPC Staff Scorns and Ignores the Designation Document That Was Adopted Pursuant To Statutory Mandate and Which Was Required to Be The Basis of Decision-making**

81. Right from the start, LPC staff did not acknowledge the existence of the Designation Document, much less the importance of reading, interpreting or applying it but launched into a confusing series of statements about the importance of fealty to historical visual elements which were eventually summarized by LPC Deputy Director of Preservation Bernadette Artus, when she stated to the New York State Supreme Court in a sworn affidavit that "a historic district is intrinsically and ultimately about architectural styles, i.e., about the buildings and the features, including fences." all the while ignoring the agency's already-recognized and established willingness to approve bold and extreme architectural changes to landmarked structures and established 1st Dept. precedent to the effect that low-quality insignificant architecture could still support a designation based upon other non-visual considerations.[7]

---

[6] As will be seen *infra*, Hui and the individual Defendants had help in implementing their nefarious scheme —  from a Supreme Court Justice who should have recused herself from the case due to an obvious bias and four appellate Division Justices who, instead of complying with their ethical obligations to call out the misconduct of the Supreme Court Justice, chose instead to rally behind her, conceal the misconduct — so far, Plaintiff will call it all to the attention of the New York State Commission on Judicial Conduct) — and lock it in by denying Plaintiff a day in appellate court.

[7] In *Stahl York Avenue Company LLC v. City of New York*, 76 A.D.3d 290, 298 (1st Dept. 2010) the First Department rejected a challenge to the landmarking of buildings that, according to a Petitioner, "are not worthy of landmark status . . . . being without architectural distinction" and ruled instead that "[t]he designation of the buildings is thus based upon historical and cultural, rather than just architectural, grounds. The LPC is clearly authorized to designate as landmarks structures with special historical interest or value which are reflective of the 'development, heritage, or

82. More confusing was the question of whether or not Plaintiff's property was already fenced when the designation took effect, which LPC staff was asserted in 1980.

83. Eventually, Gerstein found the Designation Document on his own through Google search and learned that the district was designated in late 1993, not 1980.[8]

84. Rather than embracing the Designation Document as "the basis for designation and regulation of future alterations" staff ignored it and later sought to demean it in Court when Bernadette Artus, swore in a Supreme Court affidavit, that "a designation report *merely supports* the designation of a historic district (emphasis supplied)."

85. Plaintiff is well aware of the fact that the ultimate decision regarding its fence was rendered not by staff member but by the Commissioners. But staff's confused and inaccurate view of the applicable standard precisely reflected those of the Commissioners as they deliberated and ruled upon Plaintiff's application and eventually voted on a ruling the unamended text of which was prepared by staff in advance of the hearing.

**D. The Purpose of the Jackson Heights Historic District — as per the Designation Document**

86. Unlike the LPC or any person on its staff, Gerstein, as counsel for Plaintif, carefully read and analyzed the Designation Document.

87. Upon reading this lengthy, detailed and educationally-rich document,[9] Gerstein learned from its text that the basis for the Jackson Heights designation was not to preserve aesthetic details

---

cultural characteristics of the city. As this Court stated in Society for Ethical Culture in City of N.Y., '[i]f the preservation of landmarks were limited to only that which has extraordinary distinction or enjoys popular appeal, much of what is rare and precious in our architectural and historical heritage would soon disappear.'"

[8] This contradicts oft-repeated legal boilerplate regarding agency expertise, and supports what many practitioners and citizens know all too well — that the doctrine of agency expertise is a formalistic presumption of law but one that is not necessarily related to actual facts, which often reveal remarkable degrees of ignorance and/or amateurishness of agencies.

[9] Or, at least, as rich as Gerstein initially assumed it to be before he learned about what it concealed regarding the district's racist discriminatory purpose; a matter that will be addressed in a separate state-court action.

of the structures and properties, which are undistinguished at best (and never described in the document using language that could signify aesthetic significance but are only described in terms of features that are naively catalogued), but to preserve an important element of city-planning history in New York.

88. The planning orientation is evident throughout the text of the document. It's what must be recognized and addressed in order for the LPC to rationally use the report "as the basis for . . . regulation of future alterations."

89. The document started with a discussion of the urban social and health problems that motivated city planners of the late 19th Century to seek solutions, and progressed on to the Garden Cities Movement ("a regional planning concept for laying out suburban areas, first proposed by British housing reformer Ebenezer Howard in his book *Tomorrow, a Peaceful Path to Real Reform* (1898), reprinted in 1946 as *Garden Cities of Tomorrow*.") and then to its adaptation to the urban context." While nineteenth-century Romantic Suburbs are generally exclusive enclaves with large, freestanding houses, Garden City communities incorporate clusters of houses, among other building types, along the tree-lined streets." Residential variety was expressly recognized as a guiding principle that was expressed through the introduction of varied housing types ranging from large apartment buildings to row-houses to free-standing houses and to introduce desirable features such as elevators and forms of co-operative ownership. The district was ultimately summarized as follows:

> From the earliest years, Queensboro attempted to create a complete community, not just a residential enclave, and it actively encouraged the growth of religious, educational, commercial, social, and recreational life for the residents of the area. In 1920, architectural critic John Taylor Boyd, Jr., who was among the first to write about the development of the garden apartment, wrote about Jackson Heights:

> It is no less than a small city. In the process [of developing the area] a community center with a building is already established, churches are organized, community recreations, such as playgrounds, golf links, gardens, are in operation on the corporation's land, stores are provided for, and other needs of a little city are planned for as they will be required. *This, truly, is city planning*.

This community foundation was enhanced and elaborated upon over the next thirty years.

90. Other than generic recitations of features of buildings, nothing is said about aesthetic details being significant.[10]

91. Recognizing the urban-planning theme of this Designation Document requires nothing akin to an exercise of "expert" regulatory construction. There is no other plausible interpretation. To argue that minor property specific details motivated the LPC's decision to designate the historic district would require reading the document in a manner that would contribute to a failing grade in a basic third-grade literacy test.

## E. The Argument Gerstein Wanted To Present To The LPC At The 11/24/15 Adjudicative Hearing

92. The thrust of the argument Gerstein wanted to present to the LPC at its hearing was to be about how the alteration of the fence did not in any way, shape, or form interfere with the

---

[10] The only remark remotely relating to that comes from the Ebenezer Howard *Garden Cities* treatise cited by the LPC as the inspiration for the neighborhood and designation:

> Noticing the very varied architecture and design which the houses and groups of houses display—some having common gardens and co-operative kitchens—we learn that general observance of street line or harmonious departure from it are the chief points as to house building, over which the municipal authorities exercise control, for, though proper sanitary arrangements are strictly enforced, *the fullest measure of individual taste and preference is encouraged.*

*Howard* at Kindle Locations 296-99 (Emphasis supplied).

planning considerations described in the Designation Document it was required to use as the basis for creation of the historic district.

**F.  Gerstein's Ability To Argue Is Obstructed**

93. In response to Gerstein's inquiry about the submitting "written textual arguments (like legal briefs)" in addition to the picture-laden PowerPoint presentations desired by the Commissioners, LPC staff responded that "No written arguments are required & they are not typically submitted" and in response to Gerstein's inquiry as to how well versed the Commissioner would be prior to the hearing, staff advised that the Commissioners would be "reviewing a large number of presentations, so we can't say exactly how familiar they are with the project when it is being presented."

94. Defendant Weiss was more explicit, having informed Gerstein that the "Commissioners tend to focus on visuals whether they be plans or drawings or, as in your case, photographs." He further stated that the "Commissioners know the law so I suggest dropping the slides discussing the law. The procedural objections and reservation of rights, and discussion of laches can also be dropped or minimized. . . . You may want to consolidate those various legal issues onto one slide."

95. The message was clear. Legal arguments would not be prohibited, but nor would they be considered and the best Gerstein could hope for would be to do what's minimally necessary to preserve Plaintiff's right to challenge the LPC later in court.

96. Hoping to get a fully favorable administrative decision without resorting to litigation, Gerstein did his best to straddle a delicate tightrope between giving the Commissioners the photographs they sought while expressing his legal position sufficiently to preserve rights in the

unfortunate event that court action would be needed (which turned out to be the case). Gerstein shoehorned his legal arguments as best he could, not into a letter or memorandum but into a form unheard of anywhere else in the legal profession: a photographic PowerPoint presentation.

**G. Gerstein's Inability To Effectively Argue To The LPC Was Material To The Outcome of the Matter**

97. The limitations under which Gerstein was pressured to reluctantly accept turned out to have been extremely prejudicial.

98. Events at the hearing confirmed that the assertion by Weiss that "Commissioners know the law" was patently false.

99. At the hearing, the Commissioners expressed no interest in the Designation Document, refused to even acknowledge that it existed and certainly made no effort to evaluate the altered state of Plaintiff's fence with reference to the Designation Document.

100. Much of the subsequent LPC deliberations didn't address the appearance of the fence as altered but focused instead on a confusing discussion of fencing in the neighborhood, grandfathering and fencing on Plaintif's block.

101. Aside from the confusion about the legal status (grandfathering) of fences, only four Commissioners spoke about the details of Plaintiff's alteration but none made reference to the Designation Document and two said things that were diametrically opposed to the Designation Document.

102. One Commissioner, Michael Devonshire, expressed, without citing any regulatory standard his, opinion, based apparently on how subjective feelings — how he felt that particular Tuesday — that if the application was *de novo* rather than a legalization, how would "recommend that brick posts be removed and it be simply a metal fence."

103. Commissioner Bland — he of the boast that the basis of decision-making is how the Commissioners feel on "any given Tuesday" — acted in accordance with the boast he would later make to the media by having said he could live with the fence given "a layering also of additions and changes . . .  plenty of other piers . . . . plenty of other fences with and without piers.. . . . and a polyglot of the context."

104. Commissioner Michael Goldblum, feeling particularly emotional about fences on that particular Tuesday argued passionately against the alteration. He not only failed to refer to the Jackson Heights Historic District Designation Report,  he went further and fabricated a completely different regulatory standard when he stated that " the original intent of the – of the design, of the – for which I think this part of the district was included, was the fact that the houses were meant to kind of sit on the ground and kind of be in a kind of more rural-ish or suburban-ish kind of environment" and complained that this fence's knee-high masonry base "really puts it behind a frame" and wondered about "that kind of separation between the public and the buildings." Even beyond his factually false statement about the basis for the designation, Goldblum's concern about barriers was irrational since he ignored the photographic evidence that the height of the fence and the slope of the front lawn were such that an ordinary person could look straight ahead from the street to the house and see the point where the foundation of the house meets the ground while being untroubled by other properties in the area in which houses are completely hidden from view by very high hedges that ran along the fronts of the properties.

105. Then-Commissioner/Chair Minakshi Srinivasan, feeling especially creative on. that particular Tuesday, followed Goldblum into the realm of fiction when she spoke — also without reference to the Designation Document — by ignoring the complete visibility of Plaintiff's house as contrasted with the complete concealment of others behind high hedges — about her view "that

fences were not supposed to be sort of barriers that -- or what's the right word -- a feature that has prominence on the streetscape." Again, what Srinivasan stated about what fences weren't supposed to be came completely from her own imagination: It had nothing to do with anything in Designation Document. Acting, not as Chair of a public agency but as if she were chairing a design committee at a private-sector architecture firm, Srinivasin and the Commissioners bandied ideas back and forth and proceeded to impose their own aesthetic preferences on the fence. Not one word was uttered that even remotely related to anything in the Designation Document.

106. The LPC commissioners even ignored the Community Board's advisory finding that Plaintiff's fence, as she built it, was "consistent with the majority of the fence of the block and is acceptable. we find the aforementioned changes do not negatively impact the visual aesthetics of the property"

107. LPC then proceeded to a vote and granted the petition to legalize, subject to the imposition of the following condition: "However, in voting to grant this approval, the Commission required: that the applicant remove the masonry posts and modify or replace the existing fence and gate with a more simply designed fence and gate."

**H. Plaintiff's Article 78 Proceeding Challenging The LPC's Ruling Is Dismissed by A Tainted Supreme Court Justice With Support And Prompting by Known-To-Be Unethical Conduct On The Part Of the Attorney Who Represented the LPC**

108. Plaintiff then commenced an Article 78 proceeding (100241/2016 N.Y. Cty.) challenging the condition imposed by the LPC on its determination of appropriateness which case was assigned to Freed.

109. During the course of oral argument, J. Freed offered a casual remark acknowledging that she was a member of the New York City Council in 1993 and that she voted in favor of the establishment of the Jackson Heights Historic District.

110. At the time, that remark produced for Gerstein a silent "uh oh" moment, but not being a courthouse regular, he was caught off guard and uncertain of the propriety of raising the issue of potential bias and proposing that the Justice recuse herself. So he let it pass hoping that she would adjudicate the case in an unbiased manner.

111. Gerstein's misplaced trust in the integrity of J. Freed is not, however, the last word on the matter since Section 100.3 (E)(1)(a) required her to act affirmatively on her own to recusing herself from the case.

112. On March 23, 2017, J. Freed rendered a decision that was shocking and irregular in many respects most of which will be discussed in connection with the claims asserted against Defendant 1st Dept.

113. The portion of the determination relevant to Defendants LPC, Carroll, Silberman, Weiss, and Brodsky relate to Freed's ruling with regard to Plaintiff's claim that LPC and Weiss inhibited Gerstein's ability to offer legal argument to the agency — a claim that, by the way, drew no response at all from Hui (who represented LPC at Supreme Court), which in effect meant she chose to default on the issue (presumably having recognized the validity of the claim and her inability to offer any non-frivolous response).

114.  Notwithstanding the clear and obvious merit of Plaintiff's claim and Hui's sensible choice to default in answering same, J. Freed found herself forced to hunt on her own for some way, any way, to avoid making a ruling against to the LPC (which as a result of bias stemming from her prior involvement with the district, she was desperate to do).

33

115. The only thing J. Freed was able to come up with to avoid ruling in favor of Plaintiff on the issue of Plaintiff's right, via counsel, to make effective legal argument to the LPC was *Gilbert v. Board of Estimate of the City of New York*, 177 A.D.2d 252 (1st Dept. 1991)*, which Freed cited in order to rule that the Plaintiff was not entitled to offer <u>any arguments at all to the LPC</u> since the hearing it held was merely informational. Specifically, Freed's ruling stated:

> Petitioner further argues that the Commission, as it operates, "frustrates the making of legal arguments by attorneys (Gerstein Affirmation at p. 51). However, **the public hearings held by the LPC are not adversarial or adjudicative in nature, rather, they serve as fora for information gathering** (*Matter of Gilbert*, 177 AD2d at 252).

(Emphasis supplied.)

116. Silberman, Weiss, Hui and Brodsky all knew, with complete absolute 100 percent certainty that J. Freed's ruling was grotesquely wrong and if they applied the level of skill expected of any attorney inclined to behave reasonable, honorably and ethically, should have recognized the source of this obvious error as coming from J. Freed's obvious bias in the case.

117. Recognizing that the decision, if left to stand, would allow Plaintiff to refuse to comply with the condition mandated by the LPC (since no party can be constitutionally penalized for disagreeing with a view expressed by the LPC at a "fora for information gathering" and that a party can only be penalized for failure to comply with a ruling that came from an "adversarial and adjudicative" process at which the party had full due process), Gerstein chose to act ethically as an officer of the court and point out this obvious misapprehension of the situation in a motion before Freed to reargue and alter that determination.

118. Any competent or ethical attorney standing inn Hui's shoes would have joined in the motion to re-argue at least that portion of J. Freed's ruling — or would have made the motion on her own had Gerstein been willing to let it stand. At the very least, Gerstein fully expected Hui to

consent to and stipulate to that portion of the motion to reargue since doing otherwise would put

her in violation of Rule 3.1 of the New York Rules of Professional Conduct (NYRPC) which state,

in paragraph (a) that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an

issue therein, unless there is a basis in law and fact for doing so that is not frivolous" and in

paragraph (b) defines as frivolous situations wherein "the lawyer knowingly advances a claim or

defense that is unwarranted under existing law, except that the lawyer may advance such claim or

defense if it can be supported by good faith argument for an extension, modification, or reversal

of existing law . . . ."

119. Shockingly, Hui frivolously chose to violate her ethical responsibilities and her status

as an officer of the court and instead of stipulating to the obvious, she chose to oppose the motion

and gaslight the court about the nature of the hearing by asserting that same "was a hearing on an

Application for a Certificate of Appropriateness, and not a hearing to impose a civil penalty against

Petitioner."  Hui's assertion was non-responsive to the point made and complete nonsense: She

knew full well that it was an Adjudicative Hearing that presented the one and only opportunity

Plaintiff had to make arguments that would avoid eventual civil penalties.

120. Hui engaged in considerable verbal spin — gaslighting — regarding the mechanics of

LPC process but ultimately, violated NYRPC Rule 3.1 and potentially Rule 26-305, which

prohibits lawyers from presenting false statements of law or fact to a tribunal, by concealing from

the Court the reality that the hearing she knew to have been an Adjudicative Hearing was the only

opportunity Plaintiff had or would ever have (at the administrative level) at which she could have

presented arguments against an LPC directive that would have rendered her liable to civil and/or

criminal penalties for failure to comply.

121. Hui's unethical effort to support, induce, lull, and gaslight a known-to-be-tainted Supreme Court Justice who should have recused herself from the case into sticking with a known-to-be wrong determination succeeded. By decision dated March 21, 2019, Freed stated that "petitioner fails to identify . . . any manner in which this Court misapplied a controlling principle of law" and denied the motion to reargue.

## I. Defendant 1st Dept. Allows Freed's Tainted Ruling to Stand as Does The New York State Court of Appeals

122. Plaintiff appealed to Defendant 1st Dept

123. Issues relating to appeal from denial of a motion to reargue — which is indisputably permissible in New York[11] — will be addressed below in connection with the case against Defendants 1st Dept. and State. This portion of this Complaint will only address issues involving efforts on the part of Brodsky, aided and abetted, upon information and belief, by Silberman and Weiss to induce and persuade 1st Dept. to uphold Freed's known-to-be-tainted-and-known-to-be-incorrect ruling.

124.   The Briefs submitted to 1st Dept. on behalf of Plaintiff argued explicitly and vigorously, on pages 36-39, that Freed, a known-to-be-tainted judge, committed reversible error in failing to have granted re-argument of her determination regarding the nature of the LPC hearing.

125. Following up on Hui's misconduct, Brodsky representing LPC on the appeal and, upon information and belief, aided and abetted by Defendants Silberman and Weiss, refused to stipulate to the obvious — that Freed's decision was wrong — by gaslighting the 1st Dept. from

---

[11] See allegations below in connection with Defendants 1st Dept. and State.

the unavoidable reality that the LPC held an Adjudicative Hearing rather than an Informational Hearing.

126. Further misrepresenting the law in violation of Disciplinary Rule 26-305, Brodsky, aided and abetted upon information and belief by Silberman and Weiss cited in Briefs the New York Court of Appeals case of *Kaur v. New York State Urban Dev. Corp.*, 15 N.Y.3d 235, 260 (2010) for the proposition that an "agency provide the opportunity to be heard in a meaningful manner at a meaningful time" while concealing the fact that the factual portion of the opinion in *Kaur* described exactly the sort of thorough hearing Plaintiff sought at the LPC but was denied.

127. Brodsky, upon information aided and abetted by Silberman and Weiss, further argued that "[a]t the hearing, petitioner's counsel, Mr. Gerstein, presented why he believed the fence was appropriate, emphasizing that most of the properties on the block have enclosures around the perimeters of their yards" and ignored the fact that Gerstein was strongly discouraged and obstructed from making serious and substantial argument based on the city-planning nature of the Designation Document and brushed off the Weiss comment as a mere suggestion while ignoring the reality of it's being a powerful do-it-this-way-or-expect-to-lose threat.

128. More importantly, however, by arguing as she did, Brodsky, contrary to Code of Professional Responsibility 26-305, mis-presented the entire issue to the 1st Dept. by downplaying the essence of J. Freed's ruling, which was that the hearing was Informational, not Adjudicative, and that Plaintiff has no right to make any argument at all!

129. Defendant 1st Dept. chose to avoid making any decision at all on the merits of this issue chose instead to dismiss the appeal on the ground that it was from denial of a motion to reargue.

130. On May 6, 2020 Plaintiff made a motion to the First Department that it grant re-argument and/or leave to appeal to the Court of Appeals. Both motions were opposed by the LPC aided and abetted on information and belief by Brodsky, Weiss and Silberman.

131. By decision dated August 13, 2020, the 1st Dept. denied Plaintiff's motions to re-argue and/or for leave to appeal to the Court of Appeals.

132. On August 28, 2020, Plaintiff moved for leave to appeal to the Court of Appeals , which motion was opposed by the LPC aided and abetted on information and belief by Brodsky, Weiss and Silberman.

133. On November 4, 2020, the Court of Appeals dismissed the motion "upon the ground that the order sought to be appealed from does not finally determine the proceeding within the meaning of the (New York State) Constitution."

134. On December 8, 2020, Plaintiff moved for re-argument by the Court of Appeals and Brodsky, appearing on behalf of the LPC and aided and abetted upon information and belief by Silberman and Weiss, opposed same.

135. On April 1, 2021, the Court of Appeals denied the motion for re-argument.

## J. Defendants LPC, Carroll, Silberman, Weiss and Brodsky Refuse To Comply With the Now-Binding (For Better Or Worse) Judicial Decision For Which They Advocated

136. As of April 1, 2021, the date of the Court of Appeals denial of Plaintiff's motion to reargue, the law of the case  remains exactly as J. Freed stated it to be and exactly what Hui and Brodsky, aided and abetted upon information and belief by Silberman and Weiss, argued for it to be, to wit: that "the public hearings held by the LPC are not adversarial or adjudicative in nature, rather, they serve as fora for information gathering" meaning that it was an Informational Hearing as which Plaintiff had no right to make any argument at all.

137. Brodsky was clear and vociferous in her efforts to establish the LPC hearing as Informational, when she argued, on page 34 of the Brief she filed at 1st Dept., that "Petitioner's contention that the Landmarks Law violates due process because it 'frustrate[s] the ability of parties to make effective legal arguments' App. Br. 36, is all the more unfounded because the public hearing whose purpose is to gather information . . . ." Brodsky then went on to pretend Gerstein was arguing for the right to challenge the constitutionality of the Landmarks Law at the 11/24/15 hearing when in fact, Gerstein was seeking the opportunity to make a vigorous argument to the Commission that it should evaluate the appropriateness of Plaintiff's alteration on the basis of the Commission's formally promulgated Designation Document, rather than the personal aesthetic whims of the individual commissioners.

138. Most significantly, though, Brodsky clearly and unambiguously characterized the 11/24/15 LPC hearing, the only opportunity Plaintiff had to argue for the right to preserve her fence as is without incurring fines or penalties as "a hearing whose purpose is to gather information." Having succeeded in persuading the courts of New York State Judiciary to finalize its characterization of the hearing as Informational, Brodsky cannot now be heard to argue that the LPC has the right to conduct itself as it would had she "lost" her case and had the Courts determined the hearing to have been Adjudicative.

139. Brodsky doubled down on her efforts to gaslight when she described the nature of the 11/24/15 LPC hearing on page 9 of the Memorandum of Law she submitted to 1st Dept. in opposition to Plaintiff's Motion to Re-argue. She stated there that "petitioner's fifth question, seeking resolution of whether the public hearing was adversarial or a forum for information gathering, has already been answered by this Court. Gilbert v. Bd. of Estimate, 177 A.D.2d 252, 252 (1st Dep't 1991) ('The Landmarks Preservation Commission's public hearing, rather than

being adversarial or adjudicative, was strictly information gathering in nature.')." In other words, Brodsky completely and wholly adopted what she knew to have been a tainted ruling by J. Freed in furtherance of the unethical conspiracy involving Weiss and Silberman to deny Plaintiff the right of Due Process she knew would attach to an Adjudicative Hearing. By having successfully persuaded 1st Dept. (and later the Court of Appeals) to allow the nature of the 11/24/15 LPC hearing to have been finally adjudged to be Informational, Brodsky, aided and abetted by Silberman and Weiss, stands as a person under color of state law who participated in an active and successful conspiracy to deny Plaintiff her civil rights.

140. On January 21, 2021 4;43 pm, Gerstein, anticipating that the New York State Court of Appeals would deny his request for re-argument, emailed Brodsky inquiring about how to go about seeking removal of the LPC-related violation against Plaintiff's property if Freed's ruling to the effect that the LPC hearing at which Plaintiff was denied the right to make substantive legal arguments was upheld.

141. In an e-mail response dated January 21, 2021 5:06 pm, Brodsky pretending that she did not know what Gerstein was referring to, stated that "the Supreme Court upheld the Commission's decision as rational," ignored the Supreme Court ruling she successfully defended on appeal — to wit that the hearing that produced the LPC's decision was merely Informational and not Adjudicative — threatened that if Plaintiff did not comply with what now, as a matter of law, could only be deemed a recommendation resulting from a non-adjudicative fora for information "further enforcement action" could follow.

142. By subsequent email dated January 21, 2021 6:12 pm, Gerstein reminded Brodsky that the "Supreme Court also stated that Petitioner was not entitled to due process because the nature of the hearing that produced the LPC determination that was upheld was non adversarial,

non-adjudicative, and merely informational. Your office argued for it to be upheld and hence it seems reasonable to assume that includes all the logical consequences that flow therefrom. . . which means that the only thing that was upheld cannot constitutionally be subject to any enforcement action." Brodsky did not reply to this e-mail.

143. On April 29, 2021, after denial of Plaintiff's Motion for Re-argument to the New York State Court of Appeals Gerstein sent to Carroll a demand that the LPC remove the violation it had previously placed against Plaintiff's property on the ground that it could not continue to maintain same since the law of this case is exactly as the LPC, through its legal representatives, urged it to be, to wit, that LPC's hearing in this case falls under the ruling to the effect that "[T]he public hearings held by the LPC are not adversarial or adjudicative in nature, rather they, serve as a fora for information gathering." and that absent due process, which the court ruled Plaintiff was not entitled to have, the violation could not be maintained.

144. By email dated June 8, 2021 11:48 am (with cc to Brodsky), Weiss stated "Justice Freed ruled in favor of the Landmarks Preservation Commission ("LPC") and the Appellate Division, First Dept., unanimously denied your appeal of Justice Freed's ruling against re-argument. Consequently, the LPC is not removing the violation that was issued for the installation of the fence and other work in front of 34-45 83rd Street without a LPC permit. Please have corrective work, pursuant to an LPC permit, undertaken to address the illegal work to have the violation removed from your property." As Brodsky did on January 21st, 2021, Weiss pretended that he did not know the now-final ruling of Justice Freed determined that the LPC Hearing that produced the agency's determination was a non-adjudicative and non-adversarial fora for information gathering that could not constitutionally lead to any sort of enforcement action.

145. Nevertheless, Weiss' June 8, 2021 11:48 am (cc to Brodsky) email went further to threaten Plaintiff by stating "If the violation is not addressed, it can be problematic if you refinance or sell your property. There also is the potential for a summons to be issued which would result in you needing to appear before an administrative judge at the Office of Administrative Trials and Hearings."

146. In an effort to refresh Weiss' memory and afford him an opportunity to retract his frivolous and malicious threat against Plaintiff, Gerstein advised him, by email dated June 8, 2021 4:45 pm (cc to Brodsky):

> Obviously, you are aware that Justice Freed's ruling, which now stands, states that Petitioner had no right to make any legal arguments to the Commission at the 11/15 hearing because "the public hearings held by the LPC are not adversarial or adjudicative in nature, rather, they serve as fora for information gathering.
>
> You, I, Mr. Silberman, Jaquelin Hui and Clava Brodsky are all aware, as members of the bar, that the LPC has no constitutional right to threaten or impose any sort of penalties in a hearing that it "not adversarial or adjudicative in nature" but is, instead, a "fora for information gathering."
>
> Accordingly, my position is that you all are persons acting under color of state law to deprive Yu Chan Li of her civil rights and we reserve our rights to file a plenary action for injunctive relief and civil damages against individuals.

147. Neither Weiss nor Brodsky nor LPC nor any individual defendant responded to Gerstein's June 8, 2021 4:45 pm email.

148. Both threats refer to consequences that could only flow from an Adjudicative Hearing, not the Informational Hearing J. Freed wrongfully determined that it was which decision was allowed by 1st Dept. and the Court of Appeals to stand, due in large part to the misconduct of Brodsky.

149. By having knowingly, thoughtfully, and willfully adopted J. Freed's known-to-be-tainted mischaracterization of the LPC's 11/24/15 hearing as an Informational Hearing, rather than the Adjudicative Hearing they knew it to have been, Silberman, Weiss and Brodsky lied to the First Department regarding the nature of the 11/24/15 LPC hearing, induced the Appellate Division and later the Court of Appeals to allow J. Freed's tainted ruling to stand, tricked the Appellate Division and Court of Appeals to deny to Plaintiff the due process they knew she was entitled to at an Adjudicative Hearing and now that their scheme/conspiracy succeeded, leave Plaintiff's property clouded by a violation and threaten Plaintiff with OATH imposed penalties.

150. Such nefarious conduct on the part of Weiss, Silberman and Brodsky would win approval and respect from white-collar criminal organizations.

151. Such conduct will be cited in charges of unethical behavior to be brought before the Grievance Committee in New York State.

152. In the context of Federal Court, such conduct amounts to denial of civil liberties pursuant to 42 U.S.C. §1983.


**REGARDING DEFENDANT 1st DEPT**


153. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein


**A. Appealability of Denials of Motions to Re-Argue In New York**

154. The right of an aggrieved party to make a motion asking a court for leave to re-argue its ruling in codified in New York by Civil Practice Law and Rules (hereinafter "CPLR)" R 2221(d).

155. Upon information and belief, this reflects a wise, sound policy and serves the interests of judicial economy and fairness, not just to litigants but also to judges, in that it affords to all a convenient and expeditious opportunity to correct "matters of fact or law allegedly overlooked or misapprehended by the court in determining the prior motion" without needlessly imposing costs to litigants or extra burdens on Appellate Divisions to fix errors.

156. A companion right, one that seeks renewal "based upon new facts not offered on the prior motion that would change the prior determination" is also codified as CPLR R 2221(e) and likewise reflects a wise, sound policy and serves the interests of judicial economy and fairness without needlessly imposing costs on litigants or extra burdens on Appellate Divisions to make straightforward and necessary revisions.

157. That motions to re-argue and re-new are conceptually equivalent but simply differ only in detail — or put another way, are opposite sides of the same coin — is evident in that both are articulated together in CPLR R 2221(e) under the heading "Motion affecting prior order."

158. As clear as is CPLR R 2221 and the rest of Article 22 is with regard to motions affecting prior orders, CPLR §5701, dealing with appealability of same, presents a morass of confusion.

159. When it comes to the appealability of denials of motions to renew, CPLR §5701(a)(2)(viii) is as clear as any statute can possibly be expressly providing that such matters, along with a few other specifically enumerated situations, are appealable to the Appellate Division "as of right."

160. Courts and commentators on many occasions in New York assume as immutable doctrine that denial of a lower-court motion for re-argument is not appealable, as expressed by Defendant 1st Dept. in the instant case and countless other times by all four Appellate Divisions in New York State.

161. As often-repeated as that proposition is, as a matter of fact, it is absolutely, indisputably and unarguably false.

162. While CPLR §5701(a) excludes denials of motions for re-argument from matters that are appealable as of right, denials of motions for re-argument are absolutely, positively, and unquestionably included in §5701(c), which states that "An appeal may be taken to the appellate division from any order which is not appealable as of right."

163. The language of §5701(c) contemplates a formal process of making motions, but appellate precedent in New York, including at 1st Dept., supports treating the mere filing of a Notice of Appeal as if it were a motion (i.e. a request) that the Appellate Division grant permission for appeal.

164. Adding to the complexity of the situation is a layer of verbal gymnastics to the effect that "Notwithstanding all that's been said heretofore about unappealable orders, the Appellate Divisions have, of late, shown an inclination to save some appellants from dismissal of their appeals, especially where the result below appeared both devastating and ill-founded . . . ."[12] This view is clearly supported by precedent established by Defendant 1st Dept.[13]

---

[12] David Hamm, *Recognizing Appealable and Non Appealable Orders* Lexis Practice Insights accompanying CPLR §5701. Even here, however, Hamm fails to account for CPLR §5701 ( c ) and its mandate to the effect that orders not appealable as of right are appealable by permission. Hence Hamm presents a scenarios as extreme that is, in fact, expressly contemplated by clear statutory language.

[13] *See, e.g., 11 Essex St. Corp. v. Tower Ins. Co. of N.Y.*, 153 A.D.3d 1190, 1198-fn (1st Dep't 2017); *All Craft Fabricators, Inc. v. ATC Assoc., Inc.*, 153 A.D.3d 1159 (1st Dep't 2017); *Ray v Chen*, 148 AD3d 568 (1st Dept. 1977); *Mulligan v N.Y. Cornell Medical Center*, 304 AD2d 492 (1st Dep. 2003);

**B. The Substantive Issues That Were Sufficiently Important and Novel To Warrant Granting By 1st Dept. Of Permission To Appeal**

165. As stated *supra*, one important and novel issue was whether the 11/24/15 hearing held by LPC in this case was adversarial and adjudicative such as to require that Plaintiff be given a full and fair opportunity to make effective legal argument (as Plaintiff asserts) or merely a fora for information gathering (an issue on which Hui initially defaulted but which Defendant LPC and its legal representatives asserted throughout the rest of the state litigation process only to attempt disavow after they achieved final state-court victory).

166. Plaintiff went so far as to ask 1st Dept. to rule that where it is clear that an agency did not even bother to consult its own formally promulgated administrative standards, any decision rendered by the agency is arbitrary and capricious as a matter of law.

167. Plaintiff further argued that a decision by an agency cannot be allowed to stand when the record is indisputable to the effect that the determination was made on the basis of what Bland later bragged to the media was the LPC's established practice of adjudicating the appropriateness of alterations based on how the Commissioner feel on "any given Tuesday."

168. Plaintiff raised issues regarding the difference a duly-constituted agency and rouge individuals acting under color of its authority but pursuing their own private agendas and that to be considered agency action to which Court normally deferred, it must truly be agency action and not action by rouge individuals who act without reference to agency policy. Throughout state court proceedings, LPC and its legal representatives defaulted on this issue.

169. Plaintiff pointed out the obvious reality that agencies are not a constitutionally created branch of government and that when the judiciary chooses to disenfranchise itself, it is imperative

that courts take extra care to make sure administrative action is, indeed, really and truly administrative action (action being taken by individuals fully cognizant of and respectful to the reality that they are not acting on their own behalf but as representatives of the agency.

170. Plaintiff raised issues regarding whether the LPC's manner of proceeding renders the New York City Landmarks Law unconstitutional-as-administered under little-known but increasingly relevant New York precedent such as *Matter of the City of New York Relative to Acquiring Title to Property in the Boroughs of Manhattan and Queens. Fifth Avenue Coach Lines*, 18 N.Y.2d 741, 743 (1966). It was briefly visited by lower courts about a decade later. *Housing and Development Administration of the City of New York, v. Community Housing Improvement Program*, 90 Misc.2d 813, 816 (App. Term, 2d Dept. 1977)(citations omitted) *reversing on other grounds Housing and Development Administration of the City of New York, v. Community Housing Improvement Program*, 83 Misc.2d 977 (1975) *affirmed* 59 A.D. 2d 773 (2d Dept. 1977) *citing and quoting Birkenfeld v City of Berkeley* (17 Cal.3d 129, 169).

171. Plaintiff also spotlighted serious concerns regarding the integrity of the judicial process in New York State, as raised by J. Freed's (i) having knowingly and maliciously misapplied *Gilbert v. Board of Estimate of the City of New York*, 177 A.D.2d 252 (1st Dept. 1991) to rule that the LPC hearing in this case was mere fora for information gathering rather than the adversarial adjudicative due-process-requiring proceeding all Defendants know full well that it really is — a ruling so absurd that four members of the bar (so far) violated ethical rules, and three of who have subjected themselves to civil liability in this case, in an inexplicable quest to uphold (and against the interests of the agency they supposedly represented and is now stuck trying to disavow its "victory") and (ii) having pretended that she never issued the ruling she did in *Matter of 121 Varik St. Corp. v Board of Standards and Appeals of the City of New York,* 50 Misc.3d

1222(A), 2016 Misc. LEXIS 569, 2016 NY Slip Op 50224(U) (N.U. Cty. 2016, Freed, J.), a detailed ruling penned by her shortly before the case was assigned to her which ruling would have required her to rule against the LPC in the Article 78 case before her and having pretended that Plaintiff did not cite the case during the Article 78.

172. If Judges are permitted to act as J. Freed did with respect to *Matter of 121 Varik St.,* to pretend controlling precedent does not exist and to refuse to acknowledge that counsel cited same, then *stare decisis* becomes meaningless and a case could be made to amend constitutions such as to defund the judiciary.

173. The issues discussed above are novel and of critical public importance and definitely enough so to warrant 1st Dept.'s having granted permission to adjudicate the appeal even though it came to the court via appeal from an order denying a motion to re-argue. The choices by 1st Dept. (twice, once on the original appeal and again on  motion to 1st Dept. that it grant re-argument of its dismissal of the appeal) to summarily brush aside these issues is so shocking to the collective conscience of the legal community as to violate Part 100 (relating to "Judicial Conduct") of the Rules of the (New York State) Chief Administrative Judge Section 100.2  which is states "A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." and goes on,, in Part A, to state "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

174. The manner in which 1st Dept. quietly shoved important issues of administrative law into the trash does not "promote public confidence in the integrity and impartiality of the judiciary" but quite to the contrary, casts 1st Dept. as a nest of judicial malfeasance where integrity and impartiality have no place.

175. As stark as the foregoing allegations seem, it actually gets worse; much much worse, as will be detailed below.

## C. How Plaintiff Wound Up Appealing From Denial Of A Motion To Reargue

176. For reasons that can readily be inferred from the foregoing discussion of issues. Gerstein was shocked by the ruling that J. Freed made in her initial ruling having found it to have misapprehended and/or overlooked everything including, but not limited to J. Freed's appallingly wrong evaluation of the nature of the LPC hearing, an error so shocking that even LPC, Carroll, Silberman, Weiss, and Brodsky, the parties who fought for it on re-argument an appeal now refuse to accept and honor it to the point of individuals subjecting themselves to personal liability in this civil-rights action.

177. Gerstein, not being as knowledgeable about the intricacies of CPLR §5701 as he has since become, made an unfortunate error. (As noted above, the Supreme court case was Gerstein's first exposure to the judicial process after a long absence.)

178. Gerstein (naively he now knows) could not imagine that any sitting Supreme Court Justice who chose to not recuse herself would act with such transparent bias.

179. Gerstein presumed J. Freed would welcome and appreciate an opportunity to correct an obviously-wrong ruling.

180. To preserve appellate rights, Gerstein filed a timely Notice of Appeal on May 9, 2017, but also made a timely Motion to Reargue.

181. Even without as detailed a working knowledge of CPLR §5701 as Gerstein now knows he should have had, common sense alone suggested to him the likelihood of a timing

problem and made him concerned that the time it would take for the re-argument to be decided would probably exceed the time within which he would have to perfect the appeal.

182. Because Plaintiff's Notice of Appeal was filed May 9, 2017, Plaintiff had until February 9, 2018 to perfect the appeal (at that time, the deadline in the First Department was nine months).[14]

183. Not being sure how commonplace this timing dilemma would be, Gerstein telephoned the office of the Clerk of the First Department and explained the situation. The person in the clerk's office with who Gerstein spoke told him about the "motion to enlarge" and suggested he so move.

184. Gerstein immediately moved before the 1st Dept. for enlargement of time <u>for as long as it would take for the re-argument motion to be adjudicated</u>.

185. The Affirmation filed in support of the motion made it unmistakably clear that Gerstein was searching for a legally proper way to allow the Supreme Court to correct, on its own, a transparently tainted ruling while also preserving Plaintiff's right to appeal should that become necessary.

186. On November 21, 2017, 1st Dept. denied the motion on the ground that it was premature but did so without prejudice to renew in a new motion that would be returnable or after January 2, 2018.

187. That took Gerstein by surprise: He thought he was being diligent with the motion to enlarge — and in fact, hopeful that 1st Dept. would not take umbrage at his failure to have moved even sooner than he did.

188. Gerstein was perplexed by how the Court could tell him his motion to enlarge was premature when the decision was rendered less than three months before the deadline for perfecting

---

[14] Compounding the issue was Gerstein's having engaged in standard professional courtesy by having agreed to the three-month adjournment requested by the City Attorney, thus setting the return date to September 11, 2018.

the appeal: Unfortunately — for litigants — the Appellate Division rarely explains the rationale for its rulings on motions (he had and still has no idea why the motion was premature).

189. As perplexed as Gerstein was, he at least trusted that 1st Dept. had a fair and rational basis for ruling as it did.

190. Based on his (now understood to have been naive) faith in the integrity and fairness of 1st Dept., Gerstein followed that Court's guidance and made a new motion returnable after 1/2/18, but recognizing the lapse of additional time within which he could perfect the appeal, the second Affirmation was even more particular about his need for an enlargement suitable to allow the Motion to be decided without losing Plaintiff's right to the appeal.

191. On January 25, 2018, 1st Dept. granted the motion to enlarge but wound up not giving the amount of time Gerstein requested, but only until the May 2018 term.

192. So on January 25, 2018 1st Dept. told Plaintiff its time to perfect the appeal, which was initially February 9, 2018, was now "enlarged" to February 20, 2018 (the deadline for perfecting for the May 2018 Term).

193. This breathtakingly and insultingly short time frame was not in any way shape or form required by law or any discernible 1st Dept. standard.

194. During the time when Plaintiff's motions to enlarge were pending, Defendant 1st Dept. routinely gave movants far more time than it wound up giving to Plaintiff, and enough time for those other movants to properly perfect their appeals, suggesting a random approach to adjudicating such motions (which would violate due process) or a bias in favor of LPC and a deliberate attempt to lay a procedural trap that would deny Plaintiff her day in court at 1st Dept (also a violation of due process).

195. Had 1st Dept. been genuinely opposed to the Plaintiff's clearly articulated effort to obtain an open-ended enlargement to allow Plaintiff to finish one matter before moving on to another — which might have been rendered moot based on the outcome of the first case — it could simply have unconditionally denied Plaintiff's first motion on November 21, 2017.

196. Denial of the initial motion to enlarge would have given Plaintiff a reasonable period of time, 91 days (ample time to perfect the initial appeal).

197. Instead, 1st Dept. chose to gently nudge Plaintiff to the edge of the cliff by having denied the first motion and not allowing a new motion to be returnable earlier than 1/2/18 and which could not likely have been decided upon before 1/25/18; and then, instead of allowing Plaintiff to benefit from the safety of a guard rail,[15] it chose instead to remove the safety railing and gave Plaintiff a push!

198. Defendant 1st Dept. therefore put Plaintiff in a bind no Court should ever force upon any good-faith litigant.

199. Be that as it may, Plaintiff had to do something. So thinking back along the lines of reasonable-person common sense and still proceeding under the now-known-to-have-been naive assumption that 1st Dept. was not an adversary actively trying to defeat Plaintiff with "gotcha" traps constructed around the awkward and ambiguous interaction of CPLR §§ 2221, 5701, Gerstein interpreted 1st Dept.'s impractically brief enlargement period — particularly in light of its having declined to rule on the initial earlier-filed motion to enlarge — as the functional equivalent of a hint that Plaintiff should drop the first appeal in order to avoid appealing a decision the Supreme Court may correct on its own.

---

[15] That could have been achieved by giving Plaintiff more time than the May 2018 term (26 days from the date of the decision) it allowed, an amount of time it often gave to many others who made similar motions.

200. This assumption comported with common sense: After all, motions to reargue at Supreme Court are part of the law: Gerstein presumed that CPLR §2221 has to mean something — it never occurred to him that the Legislature would put a procedure into the law that would be too dangerous for any rational litigant to ever use — and that efforts to avoid adding needlessly to the Appellate Division's workload would be a matter of sound and efficient judicial administration.

201. Based on that, Gerstein did not perfect that appeal and instead, focused his attention entirely on the Motion to Reargue, as the Appellate Division essentially forced him to do.

202. J. Freed initially sat on the Motion to reargue.

203. Finally, in March 2019, Gerstein received a phone call from a person in her Chambers asking if the appeal had been perfected or if the case was settled.

204. Gerstein advised the caller that the appeal had not been perfected and that no settlement discussion has been held.

205. A few days later, now, obviously in retrospect, secure in the assumption that she could issue any ruling at all and be "protected" from appellate review — no matter how erroneous, unjust, unfair, biased, or unprofessional it would be, issued a March 21, 2019 decision doubling down with no explanation on everything that was troublesome in her initial ruling and denying re-argument.

206. Plaintiff believes Freed celebrated her March 21, 2019 largely boilerplate decision ignoring the existence of all of the points raised on re-argument with celebratory glee at the "Gotcha" metaphorical slap she maliciously delivered to Plaintiff's face.

**D. Defendant 1st Dept. Cavalierly Brushes Aside Plaintiff's Request That The Court Allow The Appeal Without Making Any Good Faith Effort To Exercise Proper Judicial Discretion**

207. At oral argument before 1st Dept. on March 10, 2020, J. Renwick opened the session with a standard statement representing that the Briefs and Appendices were read and that the Court was familiar with the cases.

208. The Briefs in the case included a specific request that 1st Dept. treat the Notice of Appeal as the equivalent of a Motion For Permission, pursuant to CPLR §5701(c), to appeal the Supreme Court's denial of the motion to reargue — in accordance with 1st Dept. precedent, which was cited.

209. Relying on the veracity of J. Renwick's statement to the effect that the Justices were familiar with the cases, Gerstein attempted to use the limited time available to him for oral argument to address the nature of the Designation Document, which he deemed the issue most likely to generate meaningful questions from the panel.

210. About four minutes into the argument, J. Mouton interjected "Counsel, I'm sorry, I feel like I've walked into the wrong appeal" and pointed out that "re-arguments are not appealable so we're just talking about (appeal from the) motion to renew." (Issues relating to a motion to renew that accompanies the motion to re-argue are not pertinent to this Civil Rights case and further proceedings relating to those facts will be addressed in a separate State-Court action.)

211. Gerstein immediately interjected that he was also asking the Court to accept appeal of the re-argument, but Justice J. Moulton countered "that's a bit of a stretch."

212. Gerstein and J. Moulton were not able to pursue the matter further given that Renwick, presiding over the panel, interjected and directed that the argument focus on the renewal.

213. Out of obvious respect for J. Renwick's directive, Gerstein trusted that the Justices would later go back to the Briefs and review and properly consider the request that the appeal be herd, and, discussed the renewal issues. regarding

214. Approximately seven minutes into the argument, while the renewal issue was being discussed, J. Oing said "you're asking us to go up against  the Landmark Commission which is pretty much a settled commission in terms of the law of this state about the landmarks commission . . . ."

215. Presuming J. Oing, along with any other sitting judge on any court, especially an appellate tribunal, is aware of the relative prerogatives of courts versus agencies, that statement amount to a Freudian slip betraying bias.

216. During the rebuttal portion of oral argument, when Gerstein attempted to point out that if the Supreme Court ruling is allowed to stand as is (including the Supreme Court's characterization of the LPC Hearing as having been merely Informational), it is likely that LPC would unconstitutionally refuse to act with respect to the Supreme Court's determination that the hearing was merely a fora information gathering and provoke a new lawsuit the LPC would necessarily lose based on the law of the case, J. Renwick responded, with respect to the Appellate Division (about 13 minutes into the argument) , that "the law of the case doesn't bind us here." J. Renwick's response was bizarre in the context of the facts of this case and suggests bias to the point that J. Renwick would allow the law to spin round and round like a weathervane and always be made to point in whatever direction it might take to hand the LPC a win.

217. When Gerstein raised the prospect that the LPC would probably fail to honor the constitutional characteristics that apply to an Informational as opposed to Adjudicative hearing, J.

Oing quipped (a bit beyond the 13-minute mark of the argument) "Well I guess then that there's another lawsuit coming then, right?" Gerstein responded "There could well be."

218. This action is the one J. Oing predicted, forecasted, or dared Plaintiff to file.

219. During the LPC's portion of the argument, discussion centered around the wisdom of the LPC's decision in a manner similar to the conversations held among the Commissioner on 11/24/15, all with absolutely no reference to the Designation Document — until the panel remembered the re-argument issue, terminated that discussion, and instead re-focused on the renewal.

220. At about the 13:30 mark of the argument, just before the end, Gerstein tried to point out, in response to the discussion that panel had with Brodsky about fences, that the Designation Document did not address fences and that we were "dealing with a very minor thing" at which point J. Renwick responded "That's not really the point, though. Minor actually is maybe the fence that had nothing, no embellishments at all, just a fence. This is much more than that considering what the requirements are."

221. J. Renwick obviously misapprehended the entire point of the case, which was that Plaintiff's fence was completely in line with the requirements as articulated in the city-planning oriented Designation Document. J. Renwick took it on faith, without discussion that the LPC's "any given Tuesday" manner of decision-making was proper and correct.

222. At that point, J. Oing interjected "All these arguments sound really good for a win if you took the direct appeal from the petition rather than this renewal[16] here." This indicates that J. Oing recognized that if Defendant 1st Dept. were to follow CPLR 5701(c) and exercise discretion to determine whether the issues raised were sufficiently novel or important to warrant adjudication

---

[16] Plaintiff suggests that J. Oing mis-spoke in that instance and that he really meant to say "re-argument."

of the appeal, it would prevent the panel from summarily ruling in favor of LPC, as it would later do.

223. J. Renwick then cut off further discussion citing lapse of time allowed for the argument, although in other cases, Appellate Divisions do allow discussion to run past the initially-set time in order to properly conclude discussion of important topics.

224. By decision dated April 16, 2020, 1st Dept. dismissed the appeal on the ground that "[t]he denial of a motion for leave to reargue is not appealable."[17] No reference was made to the fact that CPLR 5701 allows Appellate Divisions to hear appeals of matters not appeasable as of right, or to Plaintiff's request that the appeal be herd. The curt boilerplate language of the dismissal demonstrates that Defendant 1st Dept. did not reflect proper exercise of judicial discretion in deciding whether the circumstances of this particular case warranted adjudication of the appeal.

225. Plaintiff moved before 1st Dept. for re-argument based on motion papers that explicitly extracted from the Brief and appendix and explained in detail laid out all matters relating to (i) the impact of the taint of the biased Supreme Court Justice, (ii) 1st Dept.'s own role in actively having prejudiced Plaintiff's ability to perfect an appeal from J. Freed's initial decision, (iii) the obligation of 1st Dept. based on statute and 1st Dept. precedent, to  apply good-faith discretion in determining whether to allow Plaintiff to appeal to 1st Dept., and (iv) why the facts and legal issues of the case were exactly the sort that should be heard by 1st Dept.

226. By order dated August 13, 2021, 1st Dept. Denied the motions to re-argue without explanation.

---

[17] Defendant 1st Dept. cited *Aldalali v Sungold Assoc. Ltd. Partnership*, 172 AD3d 555 [1st Dept 2019]. However that case was another curt boilerplate ruling to the same effect that cited another curt boilerplate ruling that cited yet another curt boilerplate ruling and so on and so forth. 1st Dept. did not address or even acknowledge the existence of other 1st Dept. cases supporting the proposition that appeals from rulings not appealable as of right should be accepted when they raise novel or important questions.

227. During oral argument, J. Oing expressed concern nearly eight minutes into the argument, with regard to whether it was appropriate for the Appellate Division to be a "precedent setting" court.

228. Recognizing that concern, Plaintiff's motion to re-argue also included an alternative motion for an order by 1st. Dept. granting permission to appeal to the New York State Court of Appeals, which is unquestionably a precedent-setting court. That motion was also denied without explanation.

**E. Proceedings Before The New York Court of Appeals**

229. On August 8, 2020, Plaintiff applied to the New York Court of Appeals for permission to appeal to that tribunal.

230. On November 24, 2020, the Court of Appeals denied the motion on the ground that it lacked jurisdiction to entertain an appeal from what it characterized as a non-final order.

231. By motion date December 8, 2020, Plaintiff moved for re-argument and cited Court of Appeals precedent to show that the order appealed from was, in fact, final.

232. On April 1, 2021, the Court of Appeals denied the motion to re-argue.

## FIRST CAUSE OF ACTION
### Violation of Civil Rights - 42 U.S.C. §1983
### Asserted against NEW YORK CITY LANDMARKS PRESERVATION COMMISSION

233. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

234. Defendant LPC currently maintains a Landmarks-related violation against Plaintiff's property and threatens potential imposition of civil and/or criminal penalties against Plaintiff if it

refuses to comply with an LPC determination that resulted from what has, thanks to the successful efforts of LPC and its legal team, been finally determined by New York State courts to have been an Informational hearing held by LPC on 11/24/15.

235. Plaintiff asserted before the Court of New York that it did not have an adequate opportunity to effectively present legal arguments at the 11/24/15 hearing.

236. J. Freed, at Supreme Court, ruled that because the 11/24/15 was Informational and not Adjudicative, Plaintiff had no right to present argument — and she failed to rule on Plaintiff's claim that such argument as was able to have been presented was ineffective due to obstacles established by LPC. That ruling was left undisturbed on appeal.

237. Because Plaintiff was denied an opportunity to _effectively_ argue at what the parties are now bound to as having been an 11/24/15 "Informational Hearing," maintenance by LPC o the violation against Plaintiff's property and its threats of civil and/or criminal penalties are made without due process and hence violate 42 U.S.C. §1983.

238. Plaintiff is entitled to injunctive relief as demanded below.


### SECOND CAUSE OF ACTION
### Violation of Civil Rights - 42 U.S.C. §1983
### Asserted against SARAH CARROLL


239. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

240. Carroll's actions to the extent relevant to this case do not qualify for any sort of immunity because they related to obligations which, as a result of the LPC's success in state court litigation, had been reduced to mere ministerial status and because Carroll knowingly and maliciously acted in violation of clearly established statutory or constitutional rights of which a

reasonable person would have known.

241. By acting under color of state law to unlawfully maintain a cloud against title to Plaintiff's property and cause emotional distress by threatening civil and/or criminal penalties if Plaintiff fails to comply with a ruling actively sought by Defendant LPC and its legal representatives to the effect that the only "hearing" at which Plaintiff participated was a mere "fora for information", Plaintiff is entitled to compensatory damages against SARAH CARROLL.

242. By having acted willfully, knowingly, purposefully and maliciously to deprive Plaintiff of her Constitutional Right to not have title to her property damaged or be threatened with penalties without due process, Plaintiff is entitled to recover punitive damages against this individual Defendant — the award of punitive damages being an essential application of public policy designed to punish Carroll for her willful, knowing purposeful and malicious  and malicious deprivation of civil liberties, and to discourage Carrol, all others connected with the LPC and all other persons who act under color of state law from engaging in similar misconduct.

243. Plaintiff is entitled to monetary damages — compensatory and punitive — as demanded below.

### THIRD CAUSE OF ACTION
### Violation of Civil Rights - 42 U.S.C. §1983
### Asserted against MARK A. SILBERMAN

244. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

245. Silberman's actions to the extent relevant to this case do not qualify for any sort of immunity because they related to obligations which, as a result of the LPC's success in state court litigation, had been reduced to mere ministerial status and because Silberman knowingly and maliciously acted in violation of clearly established statutory or constitutional rights of which a

reasonable person would have known.

246. By acting under color of state law to unlawfully maintain a cloud against title to Plaintiff's property and cause emotional distress by threatening civil and/or criminal penalties if Plaintiff fails to comply with a ruling actively sought by Defendant LPC and its legal representatives to the effect that the only "hearing" at which Plaintiff participated was a mere "fora for information", Plaintiff is entitled to compensatory damages against MARK A. SILBERMAN.

247. By having acted willfully, knowingly, purposefully and maliciously to deprive Plaintiff of her Constitutional Right to not have title to her property damaged or be threatened with penalties without due process, Plaintiff is entitled to recover punitive damages against this individual Defendant — the award of punitive damages being an essential application of public policy designed to punish Silberman for his willful, knowing purposeful and malicious  and malicious deprivation of civil liberties and to discourage Silberman, all others connected with the LPC and all other persons who act under color of state law from engaging in similar misconduct.

248. Plaintiff is entitled to monetary damages — compensatory and punitive — as demanded below.

## FOURTH CAUSE OF ACTION
### Violation of Civil Rights - 42 U.S.C. §1983
### Asserted against JOHN WEISS

249. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

250. Weiss' actions to the extent relevant to this case do not qualify for any sort of immunity because they related to obligations which, as a result of the LPC's success in state court litigation, had been reduced to mere ministerial status and because Weiss knowingly and maliciously acted in violation of clearly established statutory or constitutional rights of which a

reasonable person would have known.

251. By acting under color of state law to unlawfully maintain a cloud against title to Plaintiff's property and cause emotional distress by threatening civil and/or criminal penalties if Plaintiff fails to comply with a ruling actively sought by Defendant LPC and its legal representatives to the effect that the only "hearing" at which Plaintiff participated was a mere "fora for information", Plaintiff is entitled to compensatory damages against JOHN WEISS.

252. By having acted willfully, knowingly, purposefully and maliciously to deprive Plaintiff of her Constitutional Right to not have title to her property damaged or be threatened with penalties without due process, Plaintiff is entitled to recover punitive damages against this individual Defendant — the award of punitive damages being an essential application of public policy designed to punish Weiss for his willful, knowing purposeful and malicious  and malicious deprivation of civil liberties and to discourage Weiss, all others connected with the LPC and all other persons who act under color of state law from engaging in similar misconduct.

253. Plaintiff is entitled to monetary damages — compensatory and punitive — as demanded below.

### FIFTH CAUSE OF ACTION
### Violation of Civil Rights - 42 U.S.C. §1983
### Asserted against CLAVA BRODSKY

254. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

255. Brodsky's actions to the extent relevant to this case do not qualify for any sort of immunity because they related to obligations which, as a result of the LPC's success in state court litigation, had been reduced to mere ministerial status and because Brodsky knowingly and maliciously acted in violation of clearly established statutory or constitutional rights of which a

reasonable person would have known.

256. By acting under color of state law to unlawfully maintain a cloud against title to Plaintiff's property and cause emotional distress by threatening civil and/or criminal penalties if Plaintiff fails to comply with a ruling actively sought by Defendant LPC and its legal representatives to the effect that the only "hearing" at which Plaintiff participated was a mere "fora for information", Plaintiff is entitled to compensatory damages against CLAVA BRODSKY.

257. By having acted willfully, knowingly, purposefully and maliciously to deprive Plaintiff of her Constitutional Right to not have title to her property damaged or be threatened with penalties without due process, Plaintiff is entitled to recover punitive damages against this individual Defendant — the award of punitive damages being an essential application of public policy designed to punish Brodsky for her willful, knowing purposeful and malicious  and malicious deprivation of civil liberties and to discourage Brodsky, all others connected with the LPC and all other persons who act under color of state law from engaging in similar misconduct.

258. Plaintiff is entitled to monetary damages — compensatory and punitive — as demanded below.

### SIXTH CAUSE OF ACTION
### Violation of Civil Rights - 42 U.S.C. §1983
### Asserted against
### APPELLATE DIVISION OF THE NEW YORK
### SUPREME COURT FIRST DEPARTMENT

259. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

260. Part 100 (relating to "Judicial Conduct") of the Rules of the (New York State) Chief Administrative Judge, Sections 100.2 states, in pertinent part:

(A) A judge shall respect and comply with the law and shall act at

all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

(B) A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment.

261. Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, Sections 100.3(B)(7) states:

A judge shall dispose of all judicial matters promptly, efficiently and fairly.

262. Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, Sections 100.3(E) states, in pertinent part:

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) (i) the judge has a personal bias or prejudice concerning a party or (ii) the judge has personal knowledge of disputed evidentiary facts concerning the proceeding;

263. Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, Sections 100.3(D) states, in pertinent part:

(1) A judge who receives information indicating a substantial likelihood that another judge has committed a substantial violation of this Part shall take appropriate action.

(2) A judge who receives information indicating a substantial likelihood that a lawyer has committed a substantial violation of the Rules of Professional Conduct (22 NYCRR Part 1200) shall take appropriate action.

264. J. Freed violated Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, Section 100.3(E) by having failed to recuse herself from the Supreme Court action and Section  103 (B)(7) by having failed to dispose of the matter fairly.

265. J. Renwick, J. Moulton, J. Oing and J. Singh had actual knowledge that J. Freed

violated Section 100.3(E) by having failed to recuse herself from the Supreme Court action and Section 103 (B)(7).

266. J. Renwick, J. Moulton, J. Oing and J. Singh violated Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, Sections 100.3(D)(1) by not only failing to take appropriate action in response to J. Free's ethical violations but also in actively supporting, endorsing and adopting them by refusing to honor their own obligations under CPLR 5701(c) and 1st Dept. precedent to adjudicate the appeal and correct J. Freed's tainted erroneous decisions.

267. Comments made by J. Oing and J. Renwick during oral argument suggest bias in violation of Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, Sections 100.3(B)(7) and Section 100.2(A) which states that "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

268. Hui and Brodsky violated the Rules of Professional Conduct (22 NYCRR Part 1200) by having argued frivolously and having misled the courts into believing with respect to the LPC 11/24/15 hearing was Informational.

269. J. Renwick, J. Moulton, J. Oing and J. Singh had actual knowledge that Hui and Brodsky violated Rules of Professional Conduct (22 NYCRR Part 1200) in the manner described above.

270. J. Renwick, J. Moulton, J. Oing and J. Singh violated Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge, Sections 100.3(D)(2) by not only failing to take appropriate action in response to ethical violations on the part of Hui and Brodsky but also in actively supporting, endorsing and adopting them by refusing to honor

their own obligations under CPLR 5701(c) and 1st Dept. precedent to adjudicate the appeal and correct the impact of the unethical actions of Hui and Brodsky insofar as they influenced J. Freed's tainted erroneous decisions.

271. Judicial decisions that facilitate by violations of Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge constitute *per se* abuse of discretion.

272. The conduct of J. Renwick, J. Moulton, J., Oing and J. Singh unlawfully and unconstitutionally deprived Plaintiff of Civil Rights, to wit, the right to her day before an Appellate Division that would adjudicate her claim of error by the Supreme Court in a fair manner consistent with Part 100 (relating to "Judicial Conduct) of the Rules of the (New York State) Chief Administrative Judge and in a manner that "promotes public confidence in the integrity and impartiality of the judiciary."

273. J. Renwick, J. Moulton, J., Oing and J. Singh unlawfully and unconstitutionally deprived Plaintiff of Civil Rights on two separate occasions, once on April 16, 2020, that being the date of the panel's initial decision, and again on August 13, 2020, that being the date of the denial of Plaintiff's alternative motions for re-argument and/or leave to appeal to the Court of Appeals.

274. The conduct of J. Renwick, J. Moulton, J., Oing and J. Singh violated 42 U.S.C. § 1983.

275. Plaintiff is entitled to injunctive relief against 1st Dept. as demanded below.

**SEVENTH CAUSE OF ACTION**
**Violation of Civil Rights - 42 U.S.C. §1983**
**Asserted against**
**APPELLATE DIVISION OF THE NEW YORK**
**SUPREME COURT FIRST DEPARTMENT**

276. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

277. Rulings by Defendant 1st Dept. on motions made by Plaintiff to enlarge the time to perfect appeal from the Notice of Appeal it initially filed based on the original Supreme Court order had the effect of preventing Plaintiff from perfecting an appeal as of right from that order and hence forcing Plaintiff into a position where it had no choice but to appeal from denial of a motion to re-argue thus giving 1st Dept. "unclean hands" that should have estopped them from refusing to adjudicate the merits of the appeal from denial of re-argument.

278. Defendant 1st Dept. violated 42 U.S.C. § 1983 by having dismissed the appeal initially on April 16, 2020 and again, especially, on August 13, 2020 when it denied Plaintiff's request that the April 16th dismissal be re-argued, at which times details of 1st Dept.'s conduct in preventing the perfection of the initial appeal were spelled out in detail  and to the point where Plaintiff asked 1st Dept. to estop itself from reusing to adjudicate the appeal.

279. Plaintiff is entitled to injunctive relief against 1st Dept. as demanded below.

**EIGHTH CAUSE OF ACTION**
**Unconstitutionality of CPLR 5701 — Equal Protection**
**Asserted against STATE OF NEW YORK**

280. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

281. Section 5701 of the New York Civil Practice Law and Rule (CPLR) treats similarly situated parties (those aggrieved by having received adverse determinations on motions made relating to prior orders under CPLR 2221) differently and unequally (insofar as orders denying motions to renew are appealable as of right while orders denying motions to re-argue are not).

282. Section 5701 of the NY CPLR violates the Equal Protection clause of the 14th Amendment to the U.S. Constitution.

283. Plaintiff is entitled to declaratory and injunctive relief as demanded below.

**NINTH CAUSE OF ACTION**
**Unconstitutionality of CPLR 5701 — As Administered**
**Asserted against STATE OF NEW YORK and**
**APPELLATE DIVISION OF THE NEW YORK**
**SUPREME COURT FIRST DEPARTMENT**

284. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

285. CPLR Section 5701(c) expressly allows orders not appealable to the Appellate Division as of right to be appealable to the Appellate Division with permission of the Appellate Division.

286. Appellate Division precedent in New York, including precedent in the 1st Dept. allows the filing of a Notice of Appeal by an aggrieved party to be considered a request for permission to appeal within the meaning of CPLR 5701(c).

287. Due process requires that when a litigant properly brings a matter before a court, the court must exercise good faith in adjudicating the matter consistent with applicable constitutional provisions, statutes, regulations and judicial precedents and must genuinely consider and assess in good faith all matters that are subject to judicial discretion,

288. Due process requires that when a litigant properly brings a matter before a court, the court may not expressly or implicitly treat that matter as if it is not properly before the court or summarily dismiss same.

289. Appellate Divisions in New York State make a frequent and regular practice of summarily dismissing appeals from orders denying motions to re-argue.

290. Section 5701 of the NY CPLR is unconstitutional as administered by Appellate Divisions in New York State.

291. Plaintiff is entitled to declaratory and injunctive relief as demanded below.


**TENTH CAUSE OF ACTION**
**Unconstitutionality of CPLR 5701 — As Applied**
**Asserted against STATE OF NEW YORK and**
**APPELLATE DIVISION OF THE NEW YORK**
**SUPREME COURT FIRST DEPARTMENT**


292. Plaintiff repeats, reiterates and re-alleges all the allegations set forth in all proceeding paragraphs as if they had been fully set forth herein.

293. CPLR Section 5701(c) expressly allows orders not appealable to the Appellate Division as of right to be appealable to the Appellate Division with permission of the Appellate Division.

294. Appellate Division precedent in New York, including precedent in the 1st Dept. allows the filing of a Notice of Appeal by an aggrieved party to be considered a request for permission to appeal within the meaning of CPLR 5701(c).

295. Due process requires that when a litigant properly brings a matter before a court, the court must exercise good faith in adjudicating the matter consistent with applicable constitutional provisions, statutes, regulations and judicial precedents and must genuinely consider and assess in

69

good faith all matters that are subject to judicial discretion,

296. Due process requires that when a litigant properly brings a matter before a court, the court may not expressly or implicitly treat that matter as if it is not properly before the court or summarily dismiss same.

297. Defendant 1st Dept. summarily dismissed the appeal from J. Free's order denying re-argument

298. Section 5701 of the NY CPLR is unconstitutional as applied by Defendant 1st Dept. to Plaintiff's case.

299. Plaintiff is entitled to declaratory and injunctive relief as demanded below.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF PRAYS FOR RELIEF AS FOLLOWS:

(i) A Permanent Mandatory Injunction ordering Defendant NEW YORK CITY LANDMARKS PRESERVATION COMMISSION to take prompt and immediate steps to remove the landmarks-related violation against Plaintiff's property;

(ii) A Permanent Injunction restraining Defendant NEW YORK CITY LANDMARKS PRESERVATION COMMISSION from threatening or seeking to impose any civil and/or criminal penalties against Plaintiff if she chooses to leave the fence in front of her property as is.

(iii) Compensatory damages against Defendants SARAH CARROLL, MARK A. SILBERMAN, JOHN WEISS and CLAVA BRODSKY sufficient to compensate for the unlawful cloud maintained against Plaintiff's property and the threat of civil and/or criminal penalties and Plaintiff's emotional distress;

(iv) Punitive damages against Defendants SARAH CARROLL, MARC A. SILBERMAN, JOHN WEISS and CLAVA BRODSKY sufficient to punish them and deter further wrongdoing;

(v) A Mandatory Injunction ordering Defendant APPELLATE DIVISION OF THE NEW YORK SUPREME COURT FIRST DEPARTMENT (i) to recall its 4/16/20 determination dismissing Plaintiff's appeal of the Supreme Court Order that denied the motion to re-argue, (ii) to recall its 8/13/20 determination denying Plaintiff's request for re-argument of the 1st Dept. dismissal of the appeal; (iii) to restore Plaintiff's appeal of the denial by J. Freed of Plaintiff's Supreme Court Motion to Re-Argue to the regular calendar for full adjudication on the merits; (iv) to disqualify Justices Renwick, Moulton, Oing and Singh from participating in any way shape or form from adjudication of the appeal — or in the alternative, and preferably, to better avoid bias or the appearance of bias , by convening a panel of Justices from one or more of the other New York State Appellate Division Departments and referring determination of the merits of the appeal to such alternative non-biased panel;

(vi) Judgment against the STATE OF NEW YORK declaring that CPLR §5701 is unconstitutional due to the different ways it treats appeals from denial of motions to renew versus motions to re-argue

(vii) Judgment against the STATE OF NEW YORK declaring that CPLR §5701 is unconstitutional due to the manner in which it is regularly administered by Appellate Divisions and different ways it treats appeals from denial of motions to renew versus motions to re-argue.

(viii) A Mandatory Injunction ordering STATE OF NEW YORK to adopt clear unambiguous and constitutionally proper measures (regulations and/or statutes including potentially revision of CPLR §5701) governing appealability of Supreme Court orders denying motions to re-argue and such other and further measures as necessary and proper to assure that all

Appellate Divisions act consistently and fairly act in accordance with such new regulations, rules or statures.

(ix) A Judgment granting such other and further relief as to the Court may seem just and proper.


Dated:  August 10,  2021

Respectfully Submitted,

_____
Marc H. Gerstein, Esq.
*Attorney for Plaintiff Yu Chan Li*
535 West 52nd Street
New York, New York 10019
Tel: (212) 713-1582
Fax: (888) 762-2169
mgerstein@yahoo.com